Alan BREECH, Plaintiff,

v.

**ALABAMA POWER COMPANY and International Brotherhood of Electrical Workers, System Council U–19, Defendants.**

**Civil Action No. 96–0339–RV–M.**

United States District Court,
S.D. Alabama,
Southern Division.

April 15, 1997.

---

Michael S. McNair, Mobile, AL, for Plaintiff.

T. Dwight Sloan, Birmingham, AL, Charles Y. Boyd, Gina Coggin, Gadsden, AL, for Defendants.

## MEMORANDUM OPINION AND ORDER

VOLLMER, District Judge.

Presently before the court are defendants' motions for summary judgment (Docs. 11 and 12) with attached exhibits. Plaintiff filed a response (Doc. 16) in opposition to the motion; supporting exhibits are attached. Thereafter, defendant Alabama Power Company ("APC") filed a reply brief (Doe.18). The court has carefully reviewed the law and considered the arguments of the parties. For the reasons set forth below, it is the decision of the court that defendants' motions for summary judgment are due to be granted.

This action was brought by plaintiff Alan Breech ("Breech") against his former employer, APC, and the union of which he was a member during his employment with APC, the International Brotherhood of Electrical Workers, System Council U–19 ("Union"). Breech brings this suit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (as amended), and the Civil Rights Act of 1991, 42 U.S.C. § 1981a,[1] to redress alleged instances of religious discrimination by APC and the Union. APC employed Breech in various positions from January, 1977 until July, 1991 when he was terminated in response to four unexcused absences. Breech has been a practicing member of the Worldwide Church of God since the Fall of 1990; he maintains that he did not attend work on these four occasions because it was contrary to his religious beliefs. One tenant of Breech's faith is that he cannot work from sundown Friday to sundown Saturday. The four unexcused absences occurred on days where his scheduled shift overlapped with this period of sabbath.

Breech asserts two causes of action in his complaint: (1) that he was illegally discharged on the basis of his religion and (2) that he was illegally discharged in retaliation for assisting another employee with an EEOC claim by submitting an affidavit with the EEOC on behalf of the employee. Breech seeks declaratory relief, an injunction against defendants' conduct, reinstatement to his position or equivalent front salary and benefits, back salary and benefits, compensatory and punitive damages, and an award of costs and attorney's fees.

## I. BACKGROUND

### A. *Jurisdiction*

Plaintiff's prayers for relief are based on 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981a. Therefore, the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

1. In the Order of September 10, 1996 (Doc. 9), the court dismissed the claims against defendant APC that were based on the Civil Rights Act of 1991, 42 U.S.C. § 1981a, because the acts giving rise to these claims occurred prior to the effective date of the statute. Therefore, the Civil Rights Act of 1991 is relevant in this action only as to defendant Union. However, as explained below, the presence of § 1981a claims against Union does not affect the legal analysis employed by the court. *See infra* footnote 9.

## B. *Venue*

Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b).

## C. *Standard of Review*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Adickes v. S.H. Kress, Inc.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). All evidence must be viewed in the light most favorable to the nonmoving party. *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1500 (11th Cir.1991); *Langston v. ACT*, 890 F.2d 380, 383 (11th Cir.1989). In ruling on a motion for summary judgment, the function of the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is an issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 242–43, 106 S.Ct. 2505, 2507, 91 L.Ed.2d 202 (1986).

The standard for awarding summary judgment is the same as that for a directed verdict: "the trial judge must grant [the motion] if, under governing law, there can be but one reasonable conclusion as to the verdict." *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir.1996). To avoid an adverse ruling on a motion for summary judgment, "the nonmoving party must provide more than a mere scintilla of evidence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir.1997). "[T]here must be a substantial conflict in evidence to support a jury question." *Id.* (quoting *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

## II. FINDINGS OF FACT

The facts pertinent to the resolution of defendants' motions for summary judgment are generally undisputed. Where there is any discrepancy in the record, the court views the evidence in the light most favorable to plaintiff, the nonmovant.[2]

APC's Barry Steam Plant, where Breech was employed at the time of his discharge, is a fossil fuel electric power generating plant located in Mobile County, Alabama. Arbitration Transcript at 107 (attached to Doc. 12) (hereinafter "Tr.") at 46. The Barry Steam Plant's operational schedule requires it to be available for the production of electricity 24 hours a day, 7 days a week, 365 days a year. Tr. at 54. Breech began his employment with APC in January, 1977 as a Utility Man and progressed through various bargaining unit positions, including Assistant Plant Control Operator, until he became a Plant Control Operator in May, 1982. He remained a Plant Control Operator, a part of the Operations Department, until he was terminated on July 24, 1991. Tr. at 48, 208–10. The Superintendent of Operations was Shelby Walker; he was responsible for the daily workings of the Operations Department. Tr. at 50.

A Collective Bargaining Agreement ("CBA") exists between APC and various locals of the Union, the International Brotherhood of Electrical Workers. Memorandum of Agreement Between Alabama Power Company and Certain Local Unions of the International Brotherhood of Electrical Workers (hereinafter "Jt. Ex. 1")[3]. Plaintiff is a member of the Union. Employees at Barry Steam Plant are scheduled on shifts to allow the plant to remain continuously operational. APC and the Union have agreed, pursuant to a Memorandum of Understanding, that each year the bargaining unit employees may select the type of shift schedule they wish to work in the following year. Tr. at 55; APC Ex. 3.

At all times material to Breech's employment, the bargaining unit employees within

---

2. In considering a motion for summary judgment, the Court views "the evidence and all inferences arising therefrom in the light most favorable to the nonmoving party." *Young v. City of Augusta*, 59 F.3d 1160, 1163 n. 4 (11th Cir.1995). Therefore, the "facts" as stated here are not necessarily those that would be found by a jury at trial.

3. The designation "Jt. Ex." refers to the exhibits jointly submitted by all parties at the arbitration hearing, discussed *infra*. *See* Transcript and Arbitration Exhibits, addendum to Document 12. The designation "APC Ex." refers to APC exhibits introduced at the arbitration hearing. And, the designation "Union Ex." refers to Union exhibits introduced at the arbitration hearing.

the Operations Department of Barry Steam Plant elected to work a rotating shift with fixed off days. Tr. at 56. A rotating shift with fixed off days means that while the shifts will rotate—e.g., day, night, evening— the employees will observe the same off days each week. Tr. at 58. The employees, on the basis of seniority, select the particular shift schedule they desire, with the most senior employee selecting first. Tr. at 58–59, 270. APC cannot override or change an employee's shift selection. Tr. at 59.

For the year 1990, Breech selected a schedule that gave him Thursday and Friday as his off days; in 1991, Breech selected a schedule that gave him Wednesday and Thursday as his off days. Tr. at 60; APC Ex. 4. None of the Plant Control Operators who were scheduled with Fridays and Saturdays as their off days were willing to swap schedules with Breech. Tr. at 269. APC disciplines and discharges employees for their failure to work their regularly scheduled shifts. Tr. at 79.

Breech was not a member of the Worldwide Church of God the entire time he worked for APC, and the first time he mentioned his interest in the Worldwide Church of God to a representative of APC was in the Spring of 1989. Tr. at 213–14. Breech did not join the Worldwide Church of God in the spring of 1989, nor was he observing any of the tenets of the church at that time. Tr. at 236–38. He began attending the Worldwide Church of God in the Fall of 1990; he also became a member of the church at this time. Tr. at 236.

The first time APC became aware that Breech did not intend to work as scheduled was following Breech's failure to report for his November 24, 1990 scheduled shift. Tr. at 152. Breech met with Shelby Walker on November 26, 1990, at which time Breech informed Walker that he was no longer going to work between sundown Friday and sundown Saturday in observance of his religious beliefs. Tr. at 154, 239–240; APC Ex. 6 at Z.

Once APC was apprised of Breech's religious beliefs, it began a series of meetings and discussions with Breech in an effort to accommodate his religious beliefs. The first such meeting occurred on December 7, 1990, and present were Breech, Lindsey Knodel (a Union Job Steward), John Tuggle (a Shift Supervisor), and Shelby Walker. Tr. at 241; APC Ex. 6 at W. Breech agrees that Walker's memorandum contained on Page W of Company Exhibit 6 fairly and accurately sets forth what was discussed on that occasion. Tr. at 241.

As a result of the December 7th meeting, APC accommodated Breech by allowing him to make shift swaps which would result in the doubling of shifts. Tr. at 243. The doubling of shifts was not allowed in the Operations Department in 1989, 1990, or 1991 except for Breech. Tr. at 244. APC also accommodated Breech by allowing him to take single days of vacation even though if Breech scheduled vacation, APC had to schedule someone else to cover his shift. Tr. at 246. APC Exhibit 10, which Breech agrees is accurate, is a summary of the occasions that APC allowed Breech to utilize shift swaps, allowed Breech to take single days or part days of vacation, and, provided him with other accommodations. Tr. at 267–68.

Breech received a written warning for his failure to report to work on November 24 and was advised that future failure to report to work would be met with increasingly severe discipline. Tr. at 240; APC Ex. 6 at Y. On April 4, 1991, Shelby Walker advised Breech that if he did not work his scheduled shift, APC would consider it a failure to report and would deal with him accordingly. APC Ex. 6 at T.

On May 3, 1991, when Breech was informed that he could not have vacation on May 4th because another employee, Robert Thomley, had already scheduled vacation, Breech informed the Shift Supervisor that he would not report as scheduled the following day. Tr. at 250–51; APC Ex. 6 at S. On May 5, 1991, Breech met with Herman Woods, a Shift Supervisor, and Alan Reeves to discuss his failure to report to work on May 4th. Tr. at 251–52; APC Ex. 6 at Q. Breech received a written reprimand on May 7, 1991, for his failure to report to work on Saturday, May 4, 1991. Tr. at 252; APC Ex. 6 at P. The written reprimand advised Breech that simi-

lar conduct would result in more severe disciplinary action up to and including discharge. APC Ex. 6 at P.

Breech met with Shelby Walker and Wayne Sheffield, the Union Vice President, and Ron Campbell on May 7, 1991, to discuss his failure to report on May 4th. Walker prepared a memorandum of the May 7th meeting, APC Ex. 6 at 0, which Breech agrees is accurate. *See* Tr. at 252–53. The memorandum states, in pertinent part:

> We also discussed the use of progressive discipline and informed [Breech] that there were only two steps left the last being termination. He was also informed that other positions, such as Helper and APC [Assistant Plant Control Operator], may provide more flexibility in scheduling his off time but that we could not guarantee particular days off in any of these positions. It was also explained to him that any change in his classification would have to be initiated by him and that it was not our desire to terminate him but if circumstances continue as they are we would have no other option.

There were more Assistant Plant Control Operators and Helpers than Plant Control Operators at Barry Steam Plant, and Breech would have been in a better position to be accommodated for his religious beliefs had he bid into one of those positions. Tr. at 227–28. At least five Assistant Plant Control Operator vacancies were posted between October, 1990 and July, 1991 at the Barry Steam Plant. APC Ex. 14. The most recent of the vacancies was posted on July 10, 1991. *Id.* Breech did not bid on any of the posted Assistant Plant control Operator positions, or a Helper position. Tr. at 234–35; 258–59. Breech testified at the arbitration hearing that he could have bid on any of the Assistant Plant Control Operator positions if he had so chosen. Tr. at 235.

The possibility of Breech transferring into a Helper position came up again on July 9, 1991 when Breech met with Ed R. Covington and Ron Campbell. Tr. at 260–61; APC Ex. 6 at D. During the July 9th meeting, Breech stated that he was not interested in transferring to any position if it would involve a pay cut. When Covington asked Breech if he was aware of any position he could be transferred to without a pay cut, Breech replied that he did not know of one. APC Ex. 6 at D.

On June 14, 1991, during two telephone calls between Breech and Woods, a Shift Supervisor, Breech informed Woods that he would not report for his scheduled shift on Saturday, June 15, 1991 because of his religious beliefs. Tr. at 253; APC Ex. 6 at N. Breech failed to report on June 15th; subsequently, he received a reprimand and a three-day suspension. Tr. at 255; APC Ex. 6 at K.

Breech met with Joe Anderson (a Union Steward), Ron Campbell, and Shelby Walker on June 18, 1991 to discuss his situation. Campbell and Walker asked Breech if he knew of any additional methods APC could use to better accommodate his religious beliefs. Breech mentioned the possibility of becoming a Relief Operator if he and Jim Smith, the Relief Operator for Barry Steam Plant Generating Units 3 and 4, were allowed to swap positions. Tr. at 255; APC Ex. 6 at J. At this June 18th meeting, Breech was advised of the seriousness of his situation— i.e., that he was facing more severe discipline—and that APC did not wish to terminate his employment, all of which is reflected in a memorandum prepared by Shelby Walker. Breech agrees that the memorandum is an accurate reflection of the June 18th discussion. Tr. at 255; APC Ex. 6 at J.

Walker's memorandum of the June 18th meeting provides in pertinent part:

> Alan [Breech], Joe Anderson, Ron Campbell and myself discussed this situation and Alan indicated that his plans had not changed and when ask [sic] if he knew of any additional method we could use to assist him he mentioned the possibility of he and Jim Smith swapping positions. I ask [sic] if he and Jim had agreed to this and if he was requesting that we look at this possibility. He said that Jim had agreed and that he did want us to look into this possibility. He was instructed to provide us with a request using the request for vacation/shift swap form and we would look into this possibility. He was informed that we did not wish to terminate his em-

ployment with Alabama Power Company but that he was giving us no option in this situation. He was informed that his next failure to report would result in his termination and he was encouraged to look at all options open to him before this occurred. He was informed that we have made every reasonable effort available to accommodate him but we could not guarantee his off days on a continuous basis. He indicated that he understood the situation and the consequences should he fail to report in the future.

On June 21, 1991, Breech and Jim Smith submitted a written request with regard to the proposed position shift; the request was granted. Tr. at 256–57; APC Ex. 6 at G.

On July 19, 1991, Breech telephoned Jimmy Wilkinson, a Shift Supervisor, and informed Wilkinson that he would not report to work on July 20, 1991 due to his religious beliefs. Tr. at 262–63; APC Ex. 6 at C. Breech did not report for his scheduled shift on July 20, 1991. Tr. at 262–63. Breech met with Shelby Walker, Ron Campbell, and Wayne Sheffield (Vice President of Local 345) on July 24, 1991 at which time he was notified that his employment with APC was terminated. Tr. at 265; APC Ex. 6 at A. The stated reason for his discharge was his continued failure to report for work. Tr. at 107; APC Ex. 8. The decision to terminate Breech was made by Ed R. Covington. Campbell Aff. The Union never agreed to waive or modify any provision of the CBA with regard to the scheduling of employees or any other provision of the CBA as it related to Breech and other employees at Barry Steam Plant. Tr. at 94.

Article III(c) of the CBA prohibits, *inter alia*, discrimination on the basis of religion, and prohibits retaliation. Jt. Ex. 1, art. III(c) at 3–4. Articles VI and VII of the CBA provide for a grievance and arbitration process embracing "all questions and grievances that may arise." The process culminates in a final and binding arbitration deci-

sion. Jt. Ex. 1 at 23–28. After Breech was terminated for his continued failure to report for work, a grievance over his termination was filed on his behalf by the Union and was processed through the grievance process. Jt. Ex. 2. Pursuant to the CBA, an arbitration hearing was held on December 15, 1993, in Mobile, Alabama in regard to Breech's discharge. Maise Aff. (attached to Doc. 12); Arbitration Decision, Ex. 1 to APC's Answer (Doc. 5). The Board of Arbitration rendered a decision dated June 17, 1994; it determined that Breech's discharge was not in violation of the CBA. Arbitration Decision, Ex. 1 to APC's Answer (Doc. 5).

In June of 1990, Breech submitted an affidavit with the EEOC on behalf of another employee, Eric Young. *See* Pl.'s Ex. 15. Young had filed a complaint against APC with the EEOC. Upper management, which was responsible for Breech's discharge, did not know about Breech's submission of the affidavit.[4] Campbell Aff. ¶ 6–12. Over a year elapsed between Breech's filing of the affidavit and his discharge.

## III. CONCLUSIONS OF LAW

### A. *The Prior Arbitration of Plaintiff's Grievance*

 Defendants vigorously argue that Breech is bound by the earlier arbitration of his grievance (submitted against APC by the Union on behalf of Breech) and, therefore, that he is not entitled to bring the present action. The Supreme Court squarely rejected defendants' contention more than 20 years ago; and, it did so under circumstance identical to those presented by the facts of this case. In *Alexander v. Gardner–Denver Company*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Court held that an employee's statutory right to trial *de novo* under Title VII is not foreclosed by his prior submission of the claim to final arbitration under the nondiscriminatory clause of a col-

4. In opposing defendants' summary judgment motions, Breech submitted an unsigned, unsworn, and un-notarized "affidavit" (Pl.'s Ex. 7.) in which he states that he told Campbell and Walker that he had filed the June, 1990 affidavit with the EEOC. The "affidavit" does not state

when Breech allegedly related this information to Campbell and Walker. Defendant APC has moved to strike this exhibit. *See* Document 19. The court finds that APC's motion is well-taken and due to be granted. Therefore, Pl.'s Ex. 7 is hereby **STRICKEN from the record.**

lective bargaining agreement ("CBA"). The Court explained as follows:

> In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both rights to be enforced in their respective appropriate forums.

*Id.* at 49–50, 94 S.Ct. at 1020. The court also held that "[i]n no event can the submission to arbitration of a claim under the nondiscrimination clause of a collective-bargaining agreement constitute a binding waiver with respect to an employee's right under Title VII" *Id.* at 52 n. 15, 94 S.Ct. at 1021 n. 15. Thus, defendants' contention that Beech has waived his right to sue under Title VII is without merit.[5]

In addition to being bound by the Supreme Court's ruling, this court firmly agrees with the holdings and reasoning of the *Alexander* decision. The court does not believe, as defendants contend, that the Supreme Court's decision in *Gilmer v. Interstate/Johnson Lane Corporation,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) repudiates the holdings in *Alexander.*[6] In *Gilmer,* the Court held that an age discrimination claim was subject to compulsory arbitration pursuant to an arbitration agreement in a securities registration application. There are two important distinctions between *Gilmer* and *Alexander,* both of which were expressly noted by the *Gilmer* court. First, in *Gilmer* the arbitration agreement at issue provided for the arbitration of the employee's statutory claims, not just contract-based claims. *Id.* at 35, 111 S.Ct. at 1656–57. In *Alexander* and the case *sub judice,* the CBA provides only for the arbitration of disputes arising under the CBA; it does not provide for the arbitration of an employee's statutory rights, such as those arising out of Title VII. Second, the *Gilmer* case did not involve a CBA, rather, it involved a individual contract. *Id.* The Court recognized that "[a]n important concern [in *Alexander* ] . . . was the tension between collective representation and individual statutory rights, a concern not applicable to the present case." *Id. See generally Pryner v. Tractor Supply Company,* 109 F.3d 354 (7th Cir.1997) (discussing the potential conflict between *Alexander* and *Gilmer* but following the holding of *Alexander* ). In sum, the court finds that *Alexander,* not *Gilmer,* states the applicable rule of law.

## B. *Union Liability*

■ Breech contends that the Union, in addition to APC, is liable for discriminatory discharge. Since the Union is not Breech's employer, it cannot be liable under this specific cause of action; such an action may lie only against the employer, in this case APC.[7]

The only possible Title VII claim[8] plaintiff would have against the Union under the facts

---

**5.** It is true that an employee may "enter into a **voluntary settlement** expressly conditioned on a waiver of [the employee's] cause of action under Title VII", *id.* (emphasis added); however, in this action, there has been no such settlement agreement.

**6.** As support for this argument, defendants cite *Austin v. Owens–Brockway Glass Container, Inc.,* 78 F.3d 875 (4th Cir.1996). This court believes that *Austin* was erroneously decided. It flies directly in the face of *Alexander,* a Supreme Court case which has never been overruled. Defendants also rely on *Bender v. A.G. Edwards & Sons, Inc.,* 971 F.2d 698 (11th Cir.1992). That case was decided under the principles of *Gilmer* because its facts and circumstances mirrored *Gilmer.* *Gilmer* and *Bender* involve individual

contracts, not collective bargaining agreements. Thus, the *Bender* case is distinguishable for the same reasons as is *Gilmer. See* discussion *infra.*

**7.** Breech does not attempt to state a cause of action against the Union for retaliatory discharge. He only charges that "the **Defendant Company** [APC] violated Section 704(A) of Title VII." Complaint at 5 (emphasis added).

**8.** Breech also did not attempt to state a claim against the Union for a breach of its statutory duty of fair representation. In the "Facts" portion of the complaint, Breech does allege that the Union "failed to properly represent the Plaintiff with regard to religious discrimination." Complaint ¶ 8. However, Breech never asserted a cause of action for a breach of duty in any

of this case would be for the Union's alleged violation of 42 U.S.C. § 2000e–2(c)(3) which provides: "It shall be an unlawful employment practice for a labor organization ... (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section." Breech has presented absolutely no evidence on this point; nor has he made specific arguments in his brief that the Union violated § 2000e–2(c)(3). Thus, Breech has not attempted to state a claim against Union under § 2000e–2(c)(3).

## C. Discriminatory Discharge

### 1. Introduction

Title VII of the Civil Rights Act of 1964 prohibits an employer from, *inter alia*, discharging an employee solely because of the religious beliefs held by the employee. Section 703(a)(1), codified as 42 U.S.C. § 2000e–2(a)(1), provides that "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual ... because of such individual's ... religion...." In addition, Title VII imposes an affirmative obligation on an employer to attempt to reasonably accommodate an employee's religious observances or practices. Section 701(j), codified as 42 U.S.C. § 2000e(j), states that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

■ Thus, a plaintiff in a Title VII religious discrimination action [9] has two legal theories available for the prosecution of his claims: "disparate treatment" and "failure to

accommodate". That a plaintiff may proceed under the avenue of disparate treatment theory in a suit alleging religious discrimination is not yet widely recognized in published case law. This court has found only one circuit court of appeals which explicitly acknowledges that a plaintiff may proceed under this prong in addition to failure to accommodate. See *Chalmers v. Tulon Company of Richmond*, 101 F.3d 1012, 1017 (4th Cir.1996). In the present case, the plaintiff has made it clear in his complaint that he does seek relief under the theory of failure to accommodate; however, he has not made it clear in his complaint whether he also seeks to prosecute his discriminatory discharge claim under disparate treatment theory. Nevertheless, there are statements in the complaint and arguments in plaintiff's response to the motions for summary judgment which support the notion that plaintiff pursues relief under the disparate treatment theory.[10] The court will broadly construe plaintiff's complaint so as to consider his allegations under both theories of discriminatory discharge.

### 2. Disparate Treatment Theory

#### a. Standards

■ To succeed under the theory of disparate treatment, Breech must show that his employer treated him differently than other employees **because of** his religious beliefs. *Chalmers v. Tulon Company of Richmond*, 101 F.3d 1012, 1017 (4th Cir.1996); 42 U.S.C. § 2000e–2(a)(1). *See also* 42 U.S.C. § 2000e–2(m) ("Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.").

portion of the complaint. Furthermore, Breech did not raise any breach of duty arguments in his opposition brief.

**9.** In this case, plaintiff Breech seeks redress via 42 U.S.C. § 1981a in addition to the relief provided by Title VII. The allocation of burdens and elements of a *prima facie* case—set forth *infra*—are the same for all employment claims stemming from these two statutory provisions. *Turnes v. AmSouth Bank. N.A.*, 36 F.3d 1057, 1060 (11th Cir.1994). Therefore, for purposes of

disposing of the summary judgment motions *sub judice*, there is no distinction between these two causes of action and the court will treat them as one.

**10.** For example, plaintiff alleges in his complaint that "[b]ecause Religion was a motivating factor, and made a difference in the decision to discharge the Plaintiff, Defendants violated Title VII." Complaint (Doc. 1) at 4. *See also* Pl.'s Br. in Opp. to Defs.' Mot. for Summ. J. at 12–13 (Doc. 16).

■ A plaintiff-employee who alleges disparate treatment with respect to his discharge may establish a *prima facie* case of religious discrimination by adducing direct or indirect evidence supporting a reasonable inference that he was discharged because of his religion. *Chalmers,* 101 F.3d at 1017. When direct evidence of discrimination is unavailable, the plaintiff may produce indirect evidence and utilize the familiar burden-shifting scheme.[11] Because Breech has not produced any direct evidence of religious discrimination and relies only on indirect evidence that he was unlawfully discharged, the court will consider Breech's disparate treatment claim within the shifting burdens framework.

■ Adapting the *prima facie* elements of a race or gender discrimination claim to the present allegations of religious discrimination, Breech must prove the following to establish a *prima facie* case of discriminatory discharge: (1) that he is a member of and/or practices a particular religion, (2) that he was qualified for the job from which he was discharged, (3) that he was discharged, and (4) that his former position was filled by a person of a different religion or a person of no religion at all. *See McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir.1995); *Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1525 (11th Cir.1991) (superseded by statute on other grounds) (citing *Jones v. Lumberjack Meats, Inc.,* 680 F.2d 98, 101 (11th Cir.1982)). **Alternatively,** Breech may satisfy the fourth requirement by showing that he was terminated while others having comparable or lesser qualifications and not of his religion were retained, or that he suffered from differential application of work or disciplinary rules. *See McDonald v. Santa Fe Trail Transportation Company,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Weaver,* 922 F.2d at 1525. The second alternative showing—that Breech suffered from differential application of work or disciplinary rules—is appropriate in the present action because it is the only showing that Breech attempted. Breech does not contend that his former position was filled by a person of a different religion or a person of no religion at all, or that he was terminated while others having comparable or lesser qualifications and not of his religion were retained.

If Breech fails to establish a *prima facie* case of discrimination, then APC need not proffer any valid reasons for its action. *Hawkins v. Ceco Corp.,* 883 F.2d 977, 981 (11th Cir.1989). But if Breech does meet his *prima facie* burdens by a preponderance of the evidence, then' a presumption of impermissible discrimination arises. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).[12]

■ When a plaintiff meets these predicates, the burden of production shifts to the defendant employer who must then come forth with admissible evidence that articulates a legitimate, nondiscriminatory reason for the adverse employment action "which, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the employment action." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). The burden of proving intentional discrimination, however, always remains with the plaintiff. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94. So when the defendant meets its burden of production, the presumption of intentional discrimination raised by the *prima facie* case is rebutted and drops completely from the case. *Hicks,* 509 U.S. at 510–11, 113 S.Ct. at 2748–49; *see also Trotter v. Board of Trustees of the University of Alabama,* 91 F.3d 1449, 1455 (11th Cir.

---

**11.** The framework used to analyze indirect evidence of disparate treatment based on religion is the same as that used for analyzing indirect evidence of disparate treatment based on race or sex, including the application of the burden-shifting scheme enunciated by the Supreme Court in *McDonnell Douglas* and its progeny. *Id.*

**12.** The burden-shifting framework articulated in *McDonnell Douglas* and its progeny is used in those cases, which are many, where the Title VII plaintiff has no direct evidence of discrimination but can come forth with circumstantial evidence of discrimination. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1527–28 (11th Cir.1997).

**1458**

1996).[13] This leaves the plaintiff with his ultimate burden of proving by a preponderance of the evidence that the adverse employment action was motivated by unlawful discriminatory intent.[14] *Trotter*, 91 F.3d at 1457.

 The methodology for analyzing a plaintiff's Title VII claim from this point forward is well-articulated in *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997):

> Once a defendant satisfies its intermediate burden of production, and the initial presumption of discrimination accompanying the prima facie case has been eliminated, the plaintiff has the opportunity to discredit the defendant's proffered explanations for its decision. According to the Supreme Court:
>
> > [The plaintiff] now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. . . .
> >
> > [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.
>
> [*Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095] In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.

(citations and parentheticals omitted). Thus, a plaintiff is not required to introduce new evidence once the burden has shifted back to him; instead, he may escape summary judg-

ment by relying solely on the evidence presented in the *prima facie* case if it sufficiently evidences discriminatory intent or discredits the employer's proffered explanation. Nonetheless, it must always be remembered that "[c]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] . . . has offered evidence of legitimate, nondiscriminatory reasons for its actions." *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376–77 (11th Cir.1996) (quotations and citations omitted).

 In *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the Supreme Court held that judgment for the plaintiff is not compelled when a plaintiff successfully discredits all of the employer's proffered nondiscriminatory reasons for the adverse employment action. At the same time, the Court "was careful to explain that such disbelief [of the employer's proffered reasons] in tandem with the plaintiff's prima facie case, is sufficient to permit the factfinder to infer discrimination." *Combs* at 1529. The Eleventh Circuit has thus interpreted Hicks to mean "that a plaintiff is entitled to survive summary judgment, and judgment as a matter of law, if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action." *Combs* at 1529. Therefore, if the court finds that Breech has established a *prima facie* case of discriminatory discharge under the disparate treatment theory, it will then have to determine whether Breech has cast "sufficient doubt" on any legitimate, non-discriminatory reasons for the termination proffered by APC such that a reasonable factfinder could conclude that the ostensible reasons were not

---

13. In meeting its burden of production, the employer "need not persuade the court that it was actually motivated by the proffered reasons." *Trotter*, 91 F.3d at 1455 (quoting *Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094). This intermediate burden of production is satisfied if the employer produces "admissible evidence which would allow the trier of fact to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* (quoting *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096).

14. Discriminatory intent is the touchstone, for "[u]nfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII." *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1074 (11th Cir.1995) (emphasis in original).

what actually motivated the adverse employment action. *See Combs* at 1538–39.

### b. *Application*

■ Breech has satisfied the first three elements of a *prima facie* case of discriminatory discharge. He has not, however, satisfied the fourth requirement—that he suffered from differential application of work or disciplinary rules. Breech attempted to make this showing with two exhibits submitted in opposition to defendants' summary judgment motions: Pl.'s Ex. 1, which is Breech's own affidavit, and pages 193–201 of Pl.'s Ex. 3, a transcript excerpt of the arbitration testimony of the Union's assistant business manager, Jeffery Allen Blanton.

In his affidavit, Breech states: "There have been many employees over the years who have had many more than four days absent [sic] for personal reasons who were not terminated. Religious reasons are no different than other personal reasons." Breech Aff. ¶ 8. This evidence is deficient for several reasons. First, Breech does not state who the other employees are or the circumstances of their absences, i.e., whether the absences were irregular or cyclical. Second, this statement is not probative as to whether he was subjected to differential application of work or disciplinary rules because he does not allege which rules were differentially applied. Finally, and most important of all, this statement amounts to nothing more than a conclusory allegation. Breech is required to offer more than conclusory allegations to establish a *prima facie* case. *Mayfield,* 101 F.3d at 1376–77.

At the arbitration hearing the Union's assistant business manager, Jeffery Allen Blanton, testified about several APC employees (other than Breech) who had trouble with unexcused absences. Tr. at 193–201. This evidence does not support Breech's contention that he was subjected to differential application of work or disciplinary rules: every one of the four employees mentioned was discharged. Breech has failed to establish a *prima facie* case of discriminatory discharge under the disparate treatment theory.

■ Even assuming that Breech established a *prima facie* case of discriminatory discharge, summary judgment for APC on the disparate treatment claim is still appropriate because Breech failed to rebut APC's evidence that it discharged him for a legitimate, non-discriminatory reason. APC has produced ample evidence that it terminated Breech solely because of his four unexcused absences. Breech had also informed APC that he intended to miss each and every shift overlapping with his sabbath if he could not arrange a shift swap or vacation day. Breech never (1) came forth with evidence demonstrating that the adverse employment action was motivated by unlawful discriminatory intent or (2) attempted to show that APC's proffered explanation was pretextual. *See Combs* (reversing district court's denial of employer's motion for judgment as a matter of law where the plaintiff failed to produce evidence sufficient to permit reasonable jurors to reject the employer's proffered explanations as pretextual).

### 3. *Failure to Accommodate Theory*
#### a. *Standards*

■ The other legal theory available to a religious discrimination claimant is known as "failure to accommodate" theory. *Id.* As noted previously, it is clear from the complaint that Breech is prosecuting his case under failure to accommodate theory. To establish a *prima facie* case of failure to accommodate, Breech must prove: (1) that he had a bona fide belief that compliance with an employment requirement would be contrary to his religious belief or practice, (2) that he informed his employer about the conflict, and (3) that he was discharged or penalized for failing to comply with the conflicting employment requirement. *Beadle v. City of Tampa,* 42 F.3d 633, 636 n. 4 (11th Cir.1995); *Chalmers v. Tulon Company of Richmond,* 101 F.3d 1012, 1019 (4th Cir. 1996).[15] If the plaintiff fails to establish a

---

**15.** In a religious accommodation case, an employee can establish a claim even though he cannot show that other employees were treated more favorably or cannot rebut an employer's legitimate, nondiscriminatory reasons for the discharge. This is because an employer must, to an extent, actively attempt to accommodate the employee's religious conduct even if, absent reli-

*prima facie* case of accommodation discrimination, then the defendant need not proffer any valid reasons for the discharge—defendant would be entitled to a judgment in its favor. But if the plaintiff does satisfy his *prima facie* burdens by a preponderance of the evidence, then the burden shifts to the employer to show either (1) that it did (or offered to) reasonably accommodate the plaintiff's religious needs, *Ansonia Board of Education v. Philbrook,* 479 U.S. 60, 68–69, 107 S.Ct. 367, 371–72, 93 L.Ed.2d 305 (1986), or (2) that it could not reasonably accommodate the plaintiff's religious needs without undue hardship,[16] *id. Chalmers,* 101 F.3d at 1019 (4th Cir.1996). The Supreme Court has made it clear that an employer's satisfaction of either alternative showing is sufficient to obtain a favorable judgment.

> [W]here the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's [proposed] alternative accommodations would result in undue hardship. As *Hardison*[17] illustrates, the extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship.

*Philbrook,* 479 U.S. at 68–69, 107 S.Ct. at 372 (footnote added). *See also Beadle v. Hillsborough County Sheriff's Department,* 29 F.3d 589, 592 (11th Cir.1994).

▇▇▇▇▇ In this case, APC has demonstrated as a matter of law that it reasonably accommodated Breech's religious beliefs. It is undisputed that APC allowed Breech to use voluntary shift swaps within its neutral, seniority-based rotating shift system. Employer authorizations of such voluntary shift swaps constitute reasonable accommodations under Title VII. *E.g. id.* at 593.[18] Additionally, the court holds that APC made other reasonable accommodations for Breech. First, it allowed him to take single days or partial days of vacation on short notice, counter to its usual practice. *See supra* p. 1452. Second, APC permitted Breech to swap positions with other employees. On July 1st and 2nd of 1991, APC allowed Breech to assume Jim Smith's Relief Operator position pursuant to the two employee's written request to swap positions. APC Ex. 10; APC Ex. 6 at G; Tr. 255–56. Finally, APC offered Breech a reasonable accommodation—which Breech declined because he did not want to take a pay cut—when it repeatedly offered to allow him to take a different position, such as Helper or Assistant Control Operator. *See supra,* pp. 1452–1453. As the Eleventh Circuit noted in *Beadle v. Hillsborough County Sheriff's Department,* 29 F.3d at 593, while an employer has a duty to make reasonable accommodations for an employee's religious beliefs, the employee has a corresponding "duty to make a good faith attempt to accommodate his religious needs through means offered by the employer." Accordingly, APC's motion for summary judgment is due to be granted as it relates to Breech's claim of failure to accommodate.

### D. Retaliatory Discharge [19]

To prevail on his retaliatory discharge claim, Breech must first establish a *prima*

---

gious motivation, the employee's conduct would supply a legitimate basis for discharge. *Chalmers,* 101 F.3d at 1018.

16. The Supreme Court has held that requiring an employer to bear more than a *de minimis* cost in order to accommodate an employee's religious practice is an undue hardship. *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 84, 97 S.Ct. 2264, 2276–77, 53 L.Ed.2d 113 (1977). *See also Beadle v. Hillsborough County Sheriff's Department,* 29 F.3d 589, 592 (11th Cir.1994).

17. *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).

18. Any contention that APC itself had to carve out, in conjunction with the Union, exceptions to its neutral seniority system or the collective bargaining agreement was soundly rejected in *Hardison,* 432 U.S. 63, 97 S.Ct. 2264. Furthermore, as previously discussed, once it is found that an employer made a reasonable accommodation, the court need not consider whether the employer considered other alternatives, including those suggested by the employee.

19. The burden shifting framework, *see supra* part III.C.2.a, is applicable to claims for retaliatory discharge and is applied in the same fashion as in claims of discriminatory discharge. *See Meeks v. Computer Associates International,* 15 F.3d 1013 (11th Cir.1994).

*facie* case by showing (1) that he engaged in a statutorily protected expression, (2) that he suffered an adverse employment action, and (3) that there is a causal relation between the protected expression and the adverse action. *Meeks v. Computer Associates International,* 15 F.3d 1013, 1021 (11th Cir.1994) (citations omitted). "Once the prima facie case is established, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action.... The plaintiff must then demonstrate that the employer's proffered explanations are a pretext for retaliation ... " (citations omitted). The burden of persuasion always remains with the plaintiff. *Id.*

■■■■ Breech has not met his *prima facie* burdens.[20] While he engaged in statutorily protected expression when he filed a statement with the EEOC on behalf of another employee (Eric Young) in June, 1990 and suffered an adverse employment action when he was terminated on July 24, 1991, he has not demonstrated a causal link between his filing of the affidavit and his discharge.

It is true that the causal link requirement is broadly construed: a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated. *Meeks,* 15 F.3d at 1021. However, where a substantial period of time has elapsed between the two events—engagement in the protected activity and the adverse employment action—the causal connection is less likely to exist absent evidence demonstrating a connection between the two events. In the present case, more than a year passed between the protected activity and the discharge. Breech's discharge was not temporally close enough to support an inference of causal connection. *See Valdez v. Mercy Hospital,* 961 F.2d 1401, 1403 (8th Cir.1992) (no retaliation found where six months passed between protected activity and termination) (superseded by statute on other grounds); *Balletti v. Sun–Sentinel Co.,*

909 F.Supp. 1539, 1549 (S.D.Fla.1995) (elapse of six months between grievance and discharge did not permit inference of causal connection); *Juarez v. Ameritech Mobile Communications, Inc.,* 746 F.Supp. 798, 804 (N.D.Ill.1990) (six months between complaint and termination too remote), *aff'd* 957 F.2d 317 (7th Cir.1992); *Maldonado v. Metra,* 743 F.Supp. 563, 568 (N.D.Ill.1990) (five month lapse between protected expression and termination too remote); *Reeves v. Digital Equipment Corp.,* 710 F.Supp. 675, 677 (N.D.Ohio 1989) (no retaliation where three months passed between protected expression and adverse employment action); *Brown v. A.S.D. Computing Center,* 519 F.Supp. 1096, 1116–17 (S.D.Ohio 1981) (discharge four months after protected activity too remote).

Because Breech cannot rely on the mere facts that he filed an affidavit and that he was discharged one year later, he has the burden of producing evidence demonstrating the existence of the causal link. The only admissible evidence offered by Breech on this point is (1) ¶9 of his February 27, 1997 affidavit (l.'s Ex. 1) and (2) APC's Answers to the EEOC's Interrogatories (Pl's Ex. 9), filed in reference to the case styled *EEOC v. Alabama Power Corporation,* Civil Action No. 91–0561–CB–S (S.D.Ala.). This evidence is not sufficient to show a causal connection. Breech's own affidavit statement amounts to nothing more than a conclusory allegation.[21] To establish a *prima facie* case, Breech is required to offer more than conclusory allegations. *See Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376–77 (11th Cir.1996).

APC's Answers to Interrogatories do not assist Breech in satisfying the causal connection requirement, either. Breech argues that the Answers to Interrogatories, *see* Pl.'s Ex. 9 ¶24–32, show that because the EEOC was questioning APC about Breech's discharge, APC knew that Breech had filed an affidavit for Eric Young. There are two flaws to this

---

20. Whether plaintiff has made out a *prima facie* case is a question of law. *See Hill v. Metropolitan Atlanta Rapid Transit Authority,* 841 F.2d 1533 (11th Cir.1988) (citing *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978)).

21. Paragraph 9 of the affidavit states in full: "With regard to the retaliation, the Company knew that I was involved with and [sic—presumably "an"] EEOC lawsuit concerning Eric Young. The EEOC filed the lawsuit, and included by [sic—presumably "my"] situation in the questions to the Company."

argument. First, the EEOC lawsuit against APC was not filed until July 16, 1991 (8 days before Breech's termination) and APC was not served until early August. *See* Docket Sheet for Civil Action No. 91–0561–CB–S (S.D.Ala.) (Doc. 17). Thus, it is not possible that the interrogatories gave APC knowledge of Breech's submission of the 1990 affidavit prior to his discharge. Second, the Interrogatories do not mention Breech's 1990 affidavit; consequently, the Interrogatories could not have informed APC of the 1990 affidavit.

Even if Breech had established a *prima facie* case of retaliatory discharge, summary judgment in favor of APC would still be appropriate because Breech has failed to rebut APC's proffered legitimate, non-discriminatory explanation for the discharge, namely, that Breech was discharged for his four unexcused absences. *See* discussion *supra* part III.C.2.b.

## IV. CONCLUSION

In light of the foregoing, APC's motion for summary judgment and the Union's motion for summary judgment are due to be, and hereby are, **GRANTED**. Final judgment in favor of defendants and against plaintiff will be entered by separate order.