United States Court of Appeals,

Eleventh Circuit.

No. 95-9202.

Christopher Todd MAYFIELD, Plaintiff-Appellant,

v.

PATTERSON PUMP COMPANY, Defendant-Appellee.

Dec. 20, 1996.

Appeal from the United States District Court for the Northern District of Georgia. (No. 2:94-CV-0005-WCO), William C. O'Kelley, Judge.

Before EDMONDSON, Circuit Judge, FAY, Senior Circuit Judge, and ALDRICH[*], Senior District Judge.

FAY, Senior Circuit Judge:

Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) (1994) and 42 U.S.C. § 1981 (1994), Appellant, Christopher Todd Mayfield ("Mayfield"), an African-American employee of Appellee, Patterson Pump Company ("Patterson") filed suit against Patterson alleging that he was discriminated against on the basis of race.[1] Patterson moved for summary judgment contending, among other reasons, that Mayfield was fired for a legitimate, nondiscriminatory reason. The district court granted summary judgment in favor of Patterson on all counts. Mayfield appeals only the district court's determination that no issue of fact exists as to whether he was unlawfully terminated on the basis

[*]Honorable Ann Aldrich, Senior U.S. District Judge for the Northern District of Ohio, sitting by designation.

[1]More specifically, Mayfield contends he was unlawfully terminated on the basis of race, subjected to a racially hostile environment, and subjected to disparate treatment on the basis of race.

of his race.  Because we find that Mayfield was fired for a legitimate, nondiscriminatory reason and that Mayfield has failed to present any evidence of pretext, we agree with the district court and affirm its order granting summary judgment.

## I. STATEMENT OF FACTS

On November 6, 1989, Mayfield was hired by Patterson, a manufacturer of fire pumps as a Pump Test Mechanic.  Approximately one month after being hired, Mayfield was promoted to Test Technician on the recommendation of his supervisor Rod Pelot ("Pelot").  Pelot, pleased with Mayfield's performance as a Test Technician, and the company, believing he had the potential to advance in management, recommended that Mayfield be sent to Patterson's supervisory development training program.

On April 1, 1992, after Mayfield's completion of the supervisory development training program and upon another recommendation from Pelot, Mayfield was promoted to Senior Test Technician, a newly created supervisory position.  In this capacity, Mayfield supervised other employees in the cleaning room and test pit.  As Senior Test Technician, instead of receiving an hourly wage, Mayfield was paid an annual salary.  Pelot further encouraged Mayfield to attend school in order to obtain future promotions, and Mayfield was also allowed to arrange his work schedule to accommodate his school schedule.

According to Pelot, upon Mayfield's promotion to Senior Test Technician his performance began to decline.  Noting this decline, Pelot talked with Mayfield about his poor performance.  On September 25, 1992, Pelot terminated Mayfield.  The written reason

for the termination was "[i]ncompetence or failure to meet reasonable standards of efficiency and repeated failure to meet production standards which results in loss of earnings to an entire group of employees." In particular, Pelot pointed to three incidents that resulted in Mayfield's dismissal. The parties disagree on some of the circumstances surrounding the three incidents. Because we are legally obligated to view the evidence in the light most favorable to the nonmoving party, we will resolve all inferences in Mayfield's favor.

The first incident involved an unexcused absence that occurred in August of 1992. On August 20, 1992, a Thursday, Mayfield asked Pelot if he could be excused from work on Saturday, August 22, 1992, in order to help a local church put a roof on his father's house. Pelot granted the request. The parties agree that it rained on Saturday, making it difficult to put a roof on Mayfield's father's house. On Friday, August 21, 1992, Mayfield asked to be excused from work that day because of an Internal Revenue Service audit taking place in Atlanta. Again, Pelot gave Mayfield permission to miss work. On Monday, August 24, 1992, Mayfield had a friend notify Pelot that he was stranded in Indianapolis, Indiana and would not be able to make work. At this point, Pelot asserts that he realized Mayfield had lied about his plans for the weekend.[2] Based on Mayfield's unexcused absence on August 24th,

---

[2]Mayfield contends that since Patterson and Pelot did not know the IRS excuse was a lie until after he was terminated, they are precluded from using this "after acquired" evidence as a reason to terminate him. While Mayfield may be correct that Pelot at the time did not know the IRS excuse was a lie, Mayfield offers no evidence to contradict Pelot's belief that Mayfield had given him some false information. It is also clear that prior to

Pelot issued him a written warning. In part the warning states that the absence on August 24th, "will be considered an unexcused absence because he failed to call me personally, of his absence. Todd is well aware of policy that either myself or Jack Claxton be notified of any absences." Mayfield contends that the reason he did not personally call Pelot on August 24th was because he did not find it necessary to wake up at 5:00 a.m. and place a call through two or three long distance carriers, when a friend could more easily take care of it. Furthermore, upon his return, Mayfield stated he was in Indianapolis interviewing with a competitor of Patterson.

The second incident involved the approval and shipment of a fire pump. Prior to its shipment, Pelot discovered that the test data of this pump, which had been approved by Mayfield for shipment, did not meet the owner's specifications. Pelot had further work done on the pump to meet the owner's approval. Mayfield affirms that the problem with the pump lay with the pump containing an erroneous number for the impeller pattern. As a result of this incident, Pelot issued Mayfield a second disciplinary reprimand.

Finally, the last event Patterson proffers as specific evidence of Mayfield's incompetence is the warranty completion of the "Sandario 2 Pump." The Sandario 2 Pump was one pump out of approximately ten that had been returned to Patterson for repairs. As Senior Test Technician, Mayfield was in charge of the cleaning

September 25, 1992, (the day Mayfield was terminated) Pelot knew Mayfield had lied about his plans for the weekend.

and testing of the pump. Mayfield's primary responsibility was to polish and grind the Sandario 2 Pump's impeller in a timely fashion.

The final completion date for the Sandario 2 Pump was set for September 21, 1992. The impeller, a part of the pump, needed to be individually tested and installed in the pump prior to September 21, 1992, the date the entire pump would be tested. As supervisor of the cleaning room and test pit, it was Mayfield's responsibility to ensure the project was completed on time.

On Thursday, September 17, 1992, the Sandario 2 Pump's impeller was received in the cleaning room. Two of Patterson's more experienced employees were unavailable to grind and polish the impeller. Terry Metcalfe ("Metcalfe") was assigned by Pelot to perform the task. Mayfield asserts that Pelot placed Metcalfe on the job, despite Mayfield's opposition because Mayfield wanted Lewis Curry ("Curry") to clean the impeller.

Metcalfe proceeded to work on the impeller on September 17th. According to Mayfield, whenever he checked on Metcalfe's progress, everything was proceeding satisfactorily. Pelot, however, asserts that when he reviewed the impeller's progress, Metcalfe seemed to be having difficulties. Metcalfe continued to work on the impeller during Friday, September 18, 1992. Curry worked on the impeller Friday night. Mayfield was not required to work on Friday night and he did not. He previously had informed Pelot that he would be attending a wedding in Atlanta on Saturday, September 19, 1992, and would be unable to work all day Saturday. However, Mayfield told Pelot that he would check on the progress of the impeller on

Saturday morning.

Sometime between four and six in the morning of Saturday, September 19, 1992, Mayfield inspected the impeller. Mayfield did not see anybody else at the plant that morning. Metcalfe apparently arrived at work at five in the morning on Saturday, but never saw Mayfield. Following his early Saturday morning inspection, Mayfield concluded the work could be completed that day.

Upon Pelot's arrival at Patterson on Saturday morning (he also never saw Mayfield), Pelot discovered that the supply of polishing pads to clean the impeller was running low, and he had to implement another procedure in order to complete the polishing on time. In sum, Pelot avers that he was required to perform Mayfield's job in order to ensure timely completion of the Sandario 2 Pump's impeller. Mayfield returned to Patterson on Sunday, September 20, 1992. Based primarily on these three incidents, Mayfield was dismissed by Pelot on September 25, 1992.

Mayfield, believing he was dismissed due to racial reasons filed the instant suit against Patterson. In support of his allegation of a discriminatory dismissal, Mayfield offers three incidents which he claims show racial animus.

The first incident occurred in July, 1991, when Gibbs Crumpton ("Crumpton"), a Patterson supervisor, used the word "nigger" in Mayfield's presence. Mayfield reported the incident to Pelot, who filed a written complaint about the episode. Jim Davis, Crumpton's supervisor, verbally reprimanded Crumpton and informed him that if it were to happen again, he would be terminated.

The next incident took place in June, 1992. Roger Poole, a Patterson employee, told Pelot to "keep his nigger [Mayfield] away from him." Pelot relayed this statement to Mayfield. Poole was issued a written warning and told if it were to happen again he would be fired.

The last episode occurred at the end of July 1992. Mayfield, while on vacation, learned from other employees that the words "Mayfield Nigger" were written on a Patterson bathroom wall. Initially, Reese Mayfield, a Patterson employee (no relation to Appellant Mayfield), informed Pelot and Al Huber, the President of Patterson, about the writing on the wall. After Reese Mayfield told Pelot and Huber, Appellant Mayfield, while on vacation, called Pelot and Huber inquiring about what was being done. Huber told Mayfield that the words had been immediately removed and he was scheduling a meeting with the company's supervisors to advise them about the company's policy concerning racial slurs. At the scheduled meeting, Huber stated that anyone caught using racial slurs would face immediate disciplinary action.

Notwithstanding these three isolated incidents, Mayfield at his deposition stated that Pelot, the person who terminated him, was not racist and did not evaluate him on the basis of race.

## II. STANDARD OF REVIEW

This Court "reviews grants of summary judgment *de novo,* applying the same legal standard employed by the district court in the first instance." *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 918 (11th Cir.1993), *reh'g denied and reh'g en banc denied,* 16 F.3d 1233 (11th Cir.1994). Summary judgment is proper if the

pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). The evidence must be viewed in the light most favorable to the nonmoving party. *Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau,* 835 F.2d 855, 856 (11th Cir.1988).

### III. ANALYSIS

Title VII prohibits discrimination on the basis of race, color, religion, sex, or national origin in a variety of employment practices. *See Walker v. NationsBank of Fla. N.A.,* 53 F.3d 1548, 1555 (11th Cir.1995).[3] In an employment discrimination case, the plaintiff bears the ultimate burden of proving that the defendant intentionally discriminated against the plaintiff. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981).

Because direct evidence of discrimination can be difficult to produce, the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), created a framework on the burden of production and order of presentation of proof to analyze circumstantial evidence of discrimination. *See Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1184, *reh'g denied,* 747

---

[3]42 U.S.C.A. § 2000e-2(a)(1) (1994) provides: "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."

F.2d 710 (11th Cir.1984) (noting that *McDonnell Douglas* framework is valuable tool for analyzing disparate treatment cases). To prove discriminatory treatment through circumstantial evidence: (1) a plaintiff must first make out a prima facie case, (2) then the burden shifts to the defendant to produce legitimate, nondiscriminatory reasons for the adverse employment action, and (3) then the burden shifts back to the plaintiff to establish that these reasons are pretextual. *McDonnell Douglas,* 411 U.S. at 802-04, 93 S.Ct. at 1824-25.

Under the first part of the *McDonnell Douglas* test, a plaintiff may establish a prima facie case by demonstrating that: (1) he was a member of a protected class, (2) he was qualified for the job, (3) he was terminated despite his qualifications, and (4) after his termination the position remained open and the employer continued to seek applicants of similar qualifications. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. The parties seem to agree that Mayfield can demonstrate a prima facie case through the four-part test in *McDonnell Douglas.* Although Patterson "does not concede" that Mayfield can establish a prima facie case, Patterson does not argue against it. Accordingly, because we believe Mayfield can establish a prima facie case and because Patterson implicitly agrees, we will not address this part of the *McDonnell Douglas* test.

Under the second part of the *McDonnell Douglas* test, the burden shifts to Patterson to produce legitimate, nondiscriminatory reasons for Mayfield's discharge. Pelot, in his affidavit, stated that he fired Mayfield because he "viewed [Mayfield's] conduct as

intentional neglect of his job responsibilities and felt that the only appropriate way to respond to such failure to perform was to terminate [Mayfield's] employment with Patterson Pump Company." The written reason for the termination was Mayfield's "[i]ncompetence or failure to meet reasonable standards of efficiency and repeated failure to meet production standards which results in loss of earnings to an entire group of employees." In support of its employment decision, Patterson offered three specific incidents as evidence of Mayfield's incompetence. The three incidents proffered by Patterson and Pelot are as discussed earlier: (1) Pelot's belief that Mayfield lied concerning his whereabouts the weekend of August 22, 1992, (2) Mayfield's approval of a pump for shipment despite its failure to meet the owner's specifications, and (3) Mayfield's performance or lack thereof on the timely completion of the Sandario 2 Pump's impeller.

These are legitimate, nondiscriminatory reasons to terminate Mayfield. We believe that Patterson has met its burden under the second part of the *McDonnell Douglas* test. Thus, we must now turn to the third part of the *McDonnell Douglas* test, which requires Mayfield to establish that Patterson's reasons for his discharge are pretextual. In *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court elaborated on the third part of the *McDonnell Douglas* test:

> The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence. *Burdine,* U.S. 450 at 256, 101 S.Ct. at 1095 (citing *McDonnell Douglas,* 411 U.S. at 804-05, 93 S.Ct. at 1825-26).

In *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the Supreme Court again attempted to clarify the *McDonnell Douglas* test. Addressing the third part of the test, the Supreme Court stated that if "the defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant." *Hicks,* 509 U.S. at 510, 113 S.Ct. at 2749. Instead, "the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven "that the defendant intentionally discriminated against [him]' because of his race." *Id.* at 511, 113 S.Ct. at 2749 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093-94 (alteration not in original).[4]

---

[4]Unfortunately, *Hicks* has not clarified the issue among the circuit courts of what proof must be presented by the plaintiff to avoid summary judgment based upon a contention that the employer's explanation was false. *See generally Waldron v. SL Industries, Inc.,* 849 F.Supp. 996, 1004 n. 11 (D.N.J.1994) (discussing circuit split), *rev'd,* 56 F.3d 491 (3d Cir.1995). In fact, an apparent conflict exists within this circuit on the issue. *See Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436 (11th Cir.1996) (noting and discussing conflict in this circuit); *Walker v. NationsBank of Fla. N.A.,* 53 F.3d 1548, 1560-65 (11th Cir.1995) (J. Johnson's specially concurring opinion discussing conflict). As stated in more detail in *Isenbergh* and *NationsBank,* the disagreement stems mainly from some language used in the Supreme Court's opinion in *Hicks,* the procedural setting of *Hicks*—a bench trial, and some opinions in this circuit which have held that the fact finder's rejection of defendant's proffered reasons is enough to defeat judgment for the employer. *See Howard v. BP Oil Co.,* 32 F.3d 520, 527 (11th Cir.1994) ("fact finder's rejection of defendant's proffered reasons is sufficient circumstantial evidence upon which to base a judgment for the plaintiff.") (citing *Hicks,* 509 U.S. at 510-11, 113 S.Ct. at 2748-49; *Hairston v. Gainesville Sun Publ. Co.,* 9 F.3d 913, 920-21 (11th Cir.1993), *reh'g denied and reh'g*

In any event, for purposes of the case before us, we need not resolve the apparent conflict within this circuit on whether a fact finder's possible disbelief of the employer's proffered reasons is sufficient to defeat judgment for the defendant or whether a plaintiff must show both that the employer's reason for the decision was false and that discrimination was the real reason, because Mayfield has failed to produce any evidence that Patterson's explanation is false or unworthy of credence.

In this case, Mayfield had to produce evidence that Patterson's reasons for his discharge were a pretext for discrimination. A plaintiff may prove pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. "[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present "significant probative' evidence on the issue to avoid summary judgment." *See Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 443-44 (11th Cir.1996) (quoting *Young v. General Foods Corp.,* 840 F.2d 825, 829 (11th Cir.1988)) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986)). "Conclusory allegations of

---

*en banc denied,* 16 F.3d 1233 (11th Cir.1994) (plaintiff can establish pretext by showing that proffered explanation is unworthy of credence). Contrary to *Howard* and *Hairston,* the *Isenbergh* panel interprets *Hicks* as requiring a plaintiff to show "that the employer's proffered reason for the adverse employment decision was false **and** that discrimination was the real reason." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 440 (11th Cir.1996) (emphasis added).

discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered ... extensive evidence of legitimate, non-discriminatory reasons for its actions." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 443-44 (11th Cir.1996) (quoting *Young v. General Foods Corp.,* 840 F.2d 825, 830 (11th Cir.1988)) (quoting *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 597 (11th Cir.1987)).

Mayfield makes the following arguments to establish that Patterson's explanation for his discharge was a pretext for discrimination:  (1) the reasons are filled with inconsistencies, (2) the reasons are not worthy of belief, and (3) a discriminatory reason was more likely the real motivation for Patterson.  However, none of Mayfield's arguments are supported in the record.

First, Mayfield asserts that the written reason for his termination which states that "[i]ncompetence or failure to meet reasonable standards of efficiency and repeated failure to meet production standards which results in loss of earnings to an entire group of employees" is inconsistent with the three specific examples proffered by Patterson.  Instead, Mayfield contends that Patterson changed the reason it terminated him.  The district court found that "[t]he consistent reason offered for [Mayfield's] termination is failure to perform his job duties adequately.  Pelot's later statements simply offer more details regarding perceived inadequacies in plaintiff's job performance."  We agree with the district court.  There is nothing inconsistent between the written reason and the more specific reasons justifying Mayfield's

termination. The gravamen of Mayfield's termination was his failure to adequately perform his duty as Senior Test Technician. The more particular reasons given by Pelot are just specific examples of how Mayfield was incompetent and failed to meet reasonable standards of efficiency.

Next, Mayfield attempts to show that Patterson's reasons for his discharge are not worthy of belief. Mayfield, in his affidavit and depositions asserts that there are questions of fact surrounding the three incidents which indicate that the incidents were false or, at the very least, raise issues of fact that preclude the entry of summary judgment. Although there may be some questions concerning some of the details, Mayfield fails to offer evidence that the reasons for his discharge are false. He also refutes totally any suggestion that Pelot was motivated by race.

For example, Mayfield attempts to create an issue of fact regarding his approval of the pump for shipment. Mayfield concedes he approved the shipment of the pump, despite test data that revealed the failure of the pump to meet its owner's specifications. Rather, Mayfield offers as an explanation for this mishap that the pump had a wrong number for the impeller pattern. Even if we were to accept Mayfield's explanation as true, it does not explain how he would have approved shipment of the pump even though it did not satisfy the owner's specifications.

Another example concerns the Sandario 2 Pump's impeller. All that Mayfield asserts on this example is that he disagreed with the person who Pelot assigned to do the work. Mayfield does not disagree or raise a question of fact that it was his responsibility

to oversee the timely completion of the project nor that it was Pelot and not Mayfield who oversaw the cleaning and grinding of the impeller.

Finally, Mayfield alleges that a discriminatory reason more likely motivated Patterson and Pelot's decision to terminate him. In support of this pretextual argument, Mayfield proffers the three racial incidents and his unexcused absence on August 24, 1992.

Mayfield proffers the unexcused absence as additional evidence that discrimination was the true reason he was terminated. On August 24, 1992, Mayfield was issued a written reprimand for failing to call Pelot or Jack Claxton personally about being absent on August 24th. Mayfield does not contest that he was absent, instead Mayfield argues this incident depicts he was treated differently than white supervisors at Patterson. According to Mayfield, white supervisors did not have to call Pelot or Claxton personally when they were going to be absent. There is simply nothing offered in support of this statement.

It is uncontroverted that Pelot recommended Mayfield for each of his promotions. It is also undisputed that Pelot immediately took corrective action following the three racist incidents referred to him by Mayfield. It is also uncontested that Pelot made the decision to fire Mayfield. Furthermore, Mayfield during his deposition stated that Pelot was not racist and did not evaluate him on the basis of race.[5] In sum, Mayfield has failed to

---

[5]A: [Pelot] didn't understand the racism down here. He was from California, so he didn't understand that.

Q: Did, did, uh, did you detect any, uh, or perceive any racism on his part?

offer any evidence to show that a discriminatory reason more likely motivated Pelot's decision to terminate him or that Pelot treated Mayfield differently from other white supervisors.  Rather, the evidence shows that Pelot was not racist and that Mayfield was fired for a legitimate, nondiscriminatory reason.

## IV. CONCLUSION

For the foregoing reasons, we conclude that there are no genuine issues of material fact and that the district court properly granted Patterson's motion for summary judgment.  The judgment of the district court is AFFIRMED.

---

A: No, I did not.

Q: Do you think that he, uh, evaluated you based upon you as an individual, rather than you—than your race?

A: Yes, he did.