The **HERITAGE CORPORATION OF SOUTH FLORIDA**, a Florida corporation, Plaintiff,

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.**, a foreign corporation, and American International Group, Inc., a foreign corporation, Defendants.

Case No. 06–22180–CIV.

United States District Court, S.D. Florida.

July 24, 2008.

Guy B. Bailey, Jr., Bailey & Dawes, L.C., Coconut Grove, FL, for Plaintiff.

Jeffrey Michael Cohen, Steven J. Brodie, Nancy Ciampa, Anthony Pelle, Carlton & Fields, P.A., Miami, FL, for Defendants.

### ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

PAUL C. HUCK, District Judge.

This cause is before the Court upon Defendants National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and American International Group, Inc.'s ("AIG") Motions for Summary Judgment (D.Es. # 57 and 55, respectively). The Court has considered the Motions and other written submissions of the parties related thereto, and all pertinent parts of the record. The Court is duly advised in the premises.

### BACKGROUND

The Plaintiff in this case is The Heritage Corporation of South Florida ("Heritage"). Edward Feinstein was Heritage's President, founder, and the sole owner of Heritage's stock. *See, e.g.,* Compl. ¶ 2; Feinstein Depo., D.E. # 79 at 2.

■ This action is predicated on a prior lawsuit (the "initial action"), which the Court will briefly describe. In that case, Heritage discovered fraudulent acts com-

mitted by some of its employees between 1996 and 2000, resulting in over $3 million in losses to the company. Heritage claimed that National Union was required to indemnify it from such losses under the terms of four fidelity bonds and three errors and omissions insurance policies that National Union issued to Heritage. When National Union denied coverage for the full amount of Heritage's losses, Heritage sued National Union to recover damages. *See Heritage Corp. of S. Fla., et al. v. Nat'l Union Fire Ins. Co. Of Pittsburgh, PA, et al.*, Case No. 01–3519–CIV–HUCK. The Court takes notice of those prior proceedings, the resolution of which is a predicate to this action and which forms an integral part of Heritage's Complaint.[1] *See* Compl. ¶¶ 29–31.

Prior to the trial in Heritage's initial action against National Union, this Court determined that Heritage's losses were not covered by any of the three errors and omissions policies issued by National Union.[2] Additionally, the Court determined that only one of the four fidelity bonds purchased by Heritage from National Union—the Financial Institution Bond in effect in 1998, when Heritage discovered its

employees' fraud (the "1998 Bond")—provided coverage for Heritage's losses.[3] Moreover, the Court determined that the 1998 Bond's coverage was limited to $1 million.

Following the trial in Heritage's initial action against National Union, the jury rendered a special interrogatory verdict finding that Heritage suffered a loss in the amount of $80,310 resulting from the fraudulent acts of its employees and that such loss was compensable under the 1998 Bond.[4] Subtracting the $25,000 deductible applicable under the terms of the 1998 Bond, the jury found Heritage entitled to recover $55,310 from National Union.[5]

Heritage is now suing National Union under sections 624.155 and 626.9541(1)(i), Florida Statutes, to recover for damages sustained on account of National Union's alleged bad faith handling of Heritage's claim. According to Heritage, National Union refused in bad faith to investigate Heritage's claims and denied coverage, which ultimately caused Heritage to go out of business. Heritage is also suing National Union's corporate parent, AIG, under sections 624.155 and 626.9541(1)(i).

---

1. While a court generally does not take judicial notice of its own records in another and distinct case even between the same parties, the Court does so here because Heritage's claims are predicated on the resolution of the previous litigation. *See Blanchard v. State Farm Mut. Auto. Ins. Co.*, 575 So.2d 1289, 1291 (Fla.1991). In addition, Heritage has incorporated in its Complaint the Court's October 29, 2002 Final Judgment in Case No. 01–3519–CIV–HUCK and other facts pertinent to this decision. Moreover, at the oral argument held on October 26, 2006, no party objected to the Court's statement that it would take judicial notice of the prior proceedings.

2. *See* Order Granting Defendant/Counter-Plaintiffs' Motion for Partial Summary Judgment on the Errors and Omissions Insurance Policies, entered August 9, 2002 in *Heritage*

*Corp.*, Case No. 01–3519–CIV–HUCK (D.E. # 172).

3. *See* Order Granting Defendant/Counter-Plaintiffs' Motion for Partial Summary Judgment on Financial Institution Bonds, entered August 9, 2002 in *Heritage Corp.*, Case No. 01–3519–CIV–HUCK (D.E. # 173).

4. *See* Final Judgment, entered October 29, 2002 in *Heritage Corp.*, Case No. 01–3519–CIV–HUCK (D.E. # 212).

5. Heritage was also required to pay $352,415.56 of National Union's attorneys' fees on account of its rejection of an offer of judgment from National Union for $250,001 on June 6, 2002. *See* Final Judgment Awarding Attorneys' Fees and Costs, entered November 4, 2005 in *Heritage Corp.*, Case No. 01–3519–CIV–HUCK (D.E. # 291).

Heritage claims losses in excess of $5 million.

In September 2006 National Union and AIG moved to dismiss the claims against them. National Union argued that Heritage failed to state a claim for bad faith under section 624.155, and AIG argued that it was not Heritage's "insurer," as contemplated by section 624.155, nor could it be held vicariously liable for National Union's alleged wrongdoing. The Court granted National Union's Motion to Dismiss on the basis that Heritage's initial action against it was not resolved favorably to Heritage. *See* Order of Dismissal, D.E. # 19. The Court reasoned that not only was Heritage entitled to recover only $55,310 on one bond from National Union, which represented only a small fraction of the requested damages of $3.8 million, but also National Union was entitled to $352,415.56 in attorneys fees from Heritage. The Court also granted AIG's Motion to Dismiss, reasoning that because it already held Heritage was not damaged by National Union's alleged bad faith, there is no damage for which AIG could be held vicariously liable. *See id.* Heritage appealed the Court's Order and the Eleventh Circuit Court of Appeals reversed, holding that "all that is required to state a claim for bad faith is that the plaintiff allege that there was a determination of liability and the extent of the plaintiff's damages," regardless of attorneys fees or the amount of damages awarded relative to the amount requested. *See* Mandate, D.E. # 32. The Eleventh Circuit remanded the case for further proceedings.

On May 21, 2008 National Union and AIG moved for summary judgment. *See* D.Es. # 57, 55. National Union moved for summary judgment on the basis that Heritage did not satisfy the conditions precedent to bringing a bad faith claim under section 624.155, that there was no point at which it could have settled Heritage's claim, that Heritage's requested damages do not meet the statutory definition of damages available under section 624.155, and also that it did cure Heritage's claim upon receipt of the CRN. AIG moved for summary judgment on the basis that it was not Heritage's "insurer" within the meaning of section 624.155, that Heritage did not satisfy the conditions precedent to bringing a bad faith claim against it, and that AIG is not vicariously liable for any of National Union's alleged wrongdoing. These Motions are the subject of this Order.

### *LEGAL STANDARD*

Summary judgment is appropriate if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law, Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allen v. Tyson Foods,* 121 F.3d 642, 646 (11th Cir.1997). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *See Allen,* 121 F.3d at 646. On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party and determine whether that evidence could reasonably sustain a jury verdict. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Allen,* 121 F.3d at 646.

Further, while the burden on the movant is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for

summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is merely colorable or not significantly probative, is not enough. *Id.*; *see also Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11th Cir.1996) (conclusory allegations and conjecture cannot be the basis for denying summary judgment).

### ANALYSIS

**A. National Union's Motion for Summary Judgment**

■ In relevant part, section 624.155(1) provides that any person may bring a civil action against an insurer when such person is damaged by an insurer's violation of section 626.9541(1)(i) (dealing with unfair claims settlement practices), or where an insurer

1. Not attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests ... [or]

3. Except as to liability coverages, failing to promptly settle claims, when the obligation to settle a claim has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage.

*Id.* § 624.155(1)(b).

**1. Conditions Precedent to Bad Faith Action Under Section 624.155**

■ One of National Union's arguments in support of its motion for summary judgment is that Heritage did not satisfy the condition precedent to bringing an action under section 624.155: proper notice. "As a condition precedent to bring-ing an action under [section 624.155], the department and the authorized insurer must have been given 60 days' written notice of the violation." *Id.* § 624.155(3)(a). This notice, or Civil Remedy Notice ("CRN"), must "state with specificity" the following information:

1. The statutory provision, including the specific language of the statute, which the authorized insurer allegedly violated.

2. The facts and circumstances giving rise to the violation.

3. The name of any individual involved in the violation.

4. Reference to specific policy language that is relevant to the violation, if any. . . .

5. A statement that the notice is given in order to perfect the right to pursue the civil remedy authorized by this section.

*Id.* § 624.155(3)(b); *see also Talat Ents., Inc. v. Aetna Cas. and Sur. Co.,* 753 So.2d 1278, 1283 (Fla.2000) ("We find that the requirements of written notice to the Department of Insurance and the insurer are conditions precedent to bringing an action under [section 624.155](1)(a) or (b)"). This CRN is "crucial to the procedural integrity of an action" under that statute. *Allstate Ins. Co. v. Clohessy,* 32 F.Supp.2d 1328, 1333 (M.D.Fla.1998). "It is, without a doubt, a condition that must be satisfied in order for one to perfect the right to sue under the statute." *Id.* Further, according to the statute, "[n]o action shall lie if, within 60 days after filing notice, the damages are paid or the circumstances giving rise to the violation are corrected." Fla. Stat. § 624.155(3)(d). This 60–day window provides a "last opportunity for insurers to comply with their claim-handling obligations when a good-faith decision by the insurer would indicate that contractual benefits are owed." *Talat,* 753 So.2d at

1284. This statute is, according to the Florida Supreme Court, to be "strictly construed." *Id.* at 1283.

National Union argues that Heritage did not provide it with a CRN sufficiently specific to satisfy the statutory requirements listed above. The Court agrees. As National Union points out, the CRN was filed in the names of two different entities: The Heritage Corporation of South Florida, and The Heritage Corporation of South Florida Employee Benefit Pension Plan and Trust. However, none of the information provided on the CRN distinguishes between these two claimants. *See* CRN, D.E. # 57–2 at 23–34. Further, only one of those claimants, The Heritage Corporation of South Florida, has sued National Union for bad faith under section 624.155—thus it is far from clear which claims in the CRN form the basis of this bad faith action. Moreover, the CRN quoted large portions of sections 624.155 and 626.9541(1)(i) but did not specify which subsections were at issue, or explain how National Union violated them. Where the CRN did invoke the statutes, it was only to say vaguely that National Union "took no action whatsoever to acknowledge, to conduct reasonable investigations, to deny or acknowledge coverage, or to attempt to settle the claims as it should have done." In the section marked "reason for notice," the box marked "other" was checked and the reason provided was "no action taken." In the portion of the form designated for a brief recitation of the "facts and circumstances giving rise to the violation," the CRN mostly recited vague facts related to its discovery of employee theft, not to National Union's actions.

The CRN also did not specify what sort of action it wanted National Union to take in response, such as pay out on certain policies, investigate certain claims, or take some other type of action. Further, the initial action involved four different fidelity bonds and three errors and omissions policies issued by National Union, but the CRN did not specify which bonds or policies were at issue, and why. The CRN did recite some language in the portion of the CRN form designated for the "specific policy language that is relevant to the violation," but there was no identifying information accompanying this language, no way to tell from where the language came or to which filing party it pertained.

Not only did the CRN fail to invoke specific bonds or policies, but it also did not explain the amounts of damage at issue caused by National Union's alleged statutory violations. On this point, the CRN is especially confusing. The only policy at issue in this bad faith action is the 1998 bond, because that is the only bond on which Heritage obtained a favorable resolution. As the Florida Supreme Court has made clear, "an insured's underlying first-party action for insurance benefits against the insurer necessarily must be resolved favorably to the insured before the cause of action for bad faith in settlement negotiations can accrue." *Blanchard,* 575 So.2d at 1291. However, without any information identifying which bonds or policies were at issue in the CRN, it is impossible to tell whether CRN invoked the 1998 bond or not—especially since the policy limit on the 1998 bond was $1 million, but the CRN claims damages of over $3 million. Further, where the CRN did mention damages, they were related to Heritage's employees' behavior, not to National Union's alleged violations of sections 624.155 and 626.954(1)(i). Indeed, the CRN described the loss incurred as "result[ing] directly or indirectly from fraudulent activities and/or embezzlements."

Given these facts, the Court finds that Heritage's CRN was not sufficiently specific to satisfy section 624.155(3)(b). "The purpose of the civil remedy notice is to give the insurer one last chance to settle a claim with its insured and avoid unneces-

sary bad faith litigation...." *Lane v. Westfield Ins. Co.*, 862 So.2d 774, 779 (Fla. 5th DCA 2003). Based on Heritage's CRN, National Union could not be expected to have been able to cure the alleged violations. The CRN is vague and "shotgun" in nature—hardly the type of specific notice required by the statute that would allow National Union an opportunity to cure.

In coming to this conclusion the Court looked to *Valenti v. Unum Life Insurance Company of America* for guidance. No. 8:04–CV–1615–T–30TGW, 2006 WL 1627276 (M.D.Fla. June 6, 2006). In that case, the plaintiff claimant argued that a civil remedy notice stating "you denied my claim" should be sufficient to place the insurer on notice of what it needed to cure, and that it was the insurer's responsibility to decipher precisely which actions needed to be cured. *Id.* at *2. The court found that argument "illogical and ... counter to the purpose of the civil remedy notice." *Id.* The court went on to say that "[i]f a simple 'you denied my claim' was sufficient to put insurers on notice, the sixty day cure period would be little more than a guessing game with the insurer attempting to correctly guess what errors the insured claimed it made in the claims handling process, or risk defending a bad faith action. This surely is not what the legislature had in mind when it created the civil remedy notice." *Id.* The court ultimately found the claimant's allegation that the defendant insurer "failed to conduct an adequate investigation" was insufficient to provide the insurer with an opportunity to cure. *Id.* Likewise, here Heritage's CRN provided so few details as to the alleged violations of sections 624.155 and

626.9541(1)(i) that it surely forced National Union to play a "guessing game" as to what, and how, to cure within 60 days.

It is difficult to follow Heritage's response to National Union's charge that it failed to provide a sufficiently specific CRN. Heritage does not address that argument substantively, instead vaguely referring to "prior depositions, ... affidavits, and ... prior trial testimony" and citing eight docket entries. Resp., D.E. # 82 at 5. Heritage's main argument appears to be that the jury in the initial action "ruled for Heritage" on this point. *Id.* Heritage reproduces the portion of the jury verdict in the initial action that asked, "Do you find that Heritage failed to give notice of loss to National Union at the earliest practicable time, not to exceed thirty days after discovery of the loss?" to which the jury answered "no." *Id.* However, this provides no support for Heritage's position that its CRN was sufficiently specific to satisfy section 624.155(3)(b). The jury never considered section 624.155 in the initial action, but rather Heritage's right to recover on various fidelity bonds and errors and omissions insurance policies.[6]

In sum, Heritage failed to comply with a condition precedent to bringing a bad faith claim under section 624.155—that is, a CRN sufficiently specific to allow National Union an opportunity to cure the alleged violations giving rise to that claim. As such, National Union is entitled to judgment as a matter of law on Heritage's section 624.155 claim.

### 2. National Union's Ability to Settle Heritage's Claim

 Even if Heritage's CRN was legally sufficient, Heritage would not prevail on

---

**6.** Heritage did attempt to recover under section 624.155 against National Union in the initial action, but that claim was dismissed without prejudice as premature on May 15, 2002. *See* Order Granting Defendants' Mo-

tion to Dismiss (Second) Amended Complaint for Damages, entered May 16, 2002 in *Heritage Corp.*, Case No. 01–3519–CIV–HUCK (D.E. # 78).

its bad faith claim against National Union. As explained above, the jury in the initial action ultimately held National Union owed Heritage $55,310 on the 1998 bond. In its Motion National Union argues that there was no point at which it could have settled Heritage's claim on the 1998 bond because Heritage would never have accepted an offer for the amount due, or $55,310. In fact, National Union claims, Heritage would not have settled for less than $3.8 million.

In support of this argument, National Union cites to *Conquest v. Auto–Owners Insurance Company*, 773 So.2d 71 (Fla. 2d DCA 1998). There, the plaintiff claimant made a settlement offer to the defendant insurer of the full $300,000 policy limit, which the insurer declined. When the claimant sued to recover, a jury found her entitled to $130,800. The claimant then sued the insurer under section 624.155, claiming that had it properly resolved her claim in good faith, she would have been able to resolve her claim for between $130,000 and $150,000 without having to file a lawsuit. The *Conquest* court upheld a directed verdict in favor of the insurer, because the claimant never gave any indication that she would have settled for a sum less than the $300,000 policy limit. *Id.* at 74. The court agreed with the trial court's finding that:

> The evidence presented by the plaintiff cannot support a finding by the jury that the defendant should have offered any specific amount at any particular time to the plaintiff. And it is precisely because the jury awarded the plaintiff less than her last demand for settlement that she cannot establish that she was damaged by some lack of the defendant's investigations standards, some failure by the defendant to act promptly upon commu-

nication, or the defendant's denial of her claim without a reasonable investigation. *Id.*

National Union also points to *Longpoint Condominium Association v. Allstate Insurance Company* on this point. No. 5:05CV45RHWCS, 2005 WL 1315810 (N.D.Fla. June 2, 2005). There, a claimant submitted a proof of loss claim to its insurer in the amount of $538,564.01. *Id.* When the insurer did not pay the requested amount, the claimant sued its insurer under section 624.155 for failure to pay that amount. *Id.* However, in the underlying action preceding the bad faith claim, the umpire held the insurer owed the claimant $100,249.68. The *Longpoint* court held the section 624.155 bad faith action failed for a variety of reasons, including that "[the claimant] gave no indication when it made its claim [in its CRN], and still has not proven nor even asserted, that it would have accepted [$100,249.68]." *Id.* at *2. The court stated that "it can hardly be characterized as actionable bad faith for an insurer to fail to tender an amount the insured would not have accepted in any event." *Id.*

Using *Conquest* and *Longpoint* as support, National Union argues that there was never a time it should or could have settled Heritage's claim, because Heritage never indicated that it would accept $55,310—the amount the jury held National Union owed Heritage on the 1998 bond. The Court finds these cases on point, and agrees with National Union that it could not have reasonably settled Heritage's claim for the amount due. As the Florida Supreme Court has explained, section 624.155 "is correctly read to authorize a civil remedy for extra contractual damages if a first-party insurer does not pay the *contractual amount due* the insured after all the policy conditions have been fulfilled within sixty days" after a valid CRN has been filed.

*Talat,* 753 So.2d at 1283 (emphasis added). In the initial action, the jury determined that the contractual amount National Union owed Heritage was $55,310 on one bond. However, Heritage has given no indication that it would have accepted an offer of $55,310. To the contrary, throughout the initial action and in this bad faith suit Heritage has consistently asserted that its damages were in the millions of dollars. Significantly, in his deposition Feinstein stated that he "[didn't] think [he] would have accepted less then [sic] three million eight" to settle the case. D.E. # 96–2 at 6. Feinstein further stated that, in response to being asked if Heritage would accept $1 million to settle the case, he stated "no" because Heritage had incurred damages in excess of $3.8 million. *Id.* Moreover, as Feinstein himself testified, after Heritage declined to accept $1 million to settle the case, National Union submitted a $250,001 settlement offer— again, Heritage declined that offer. *Id.* at 8. In its Response Heritage dismisses this evidence as "verbal jousting"—but does not point to any other evidence in the record suggesting Heritage would have accepted an offer of $55,310. Resp., D.E. # 82 at 4.[7] Indeed, the undisputed record evidence establishes that Heritage would not have accepted such an offer.

In sum, there is no genuine issue of fact as to whether National Union could have or should have settled Heritage's claim on the 1998 bond, within the limits of National Union's liability as determined by the jury in the initial action. As such, National Union is entitled to judgment as a matter of law on Heritage's bad faith claim.

---

7. Further, in its Response Heritage still maintains that "Defendants' actions have caused damages far beyond and certainly not limited to, the [$55,310] previously determined in [the initial case]." Resp., D.E. # 82 at 2. Heritage also refers the Court to a report by

### 3. Reasonable Foreseeability of Damages

■ National Union also argues that it is entitled to summary judgment because Heritage is not seeking damages "reasonably foreseeable" from the alleged violation of section 624.155. The Court agrees on this point as well.

According to section 624.155(8), the damages recoverable under the statute "include those damages which are *a reasonably foreseeable result of a specified violation of this section* by the authorized insurer and may include an award or judgment in an amount that exceeds the policy limits." (Emphasis added); *see also Imhof v. Nationwide Mut. Ins. Co.,* 643 So.2d 617, 619 (Fla.1994) ("The damages recoverable by the insured in a first-party bad-faith action are those amounts that are the consequence of the insurer's bad faith.") (citing *McLeod v. Cont'l Ins. Co.,* 591 So.2d 621, 626 (Fla.1992)).

In its Complaint Heritage details fraudulent activities and theft by its employees and states that "[a]s a result of National's conduct, Heritage suffered extensive and substantial damages and was eventually required to shut down its operations. The damages are estimated to be in excess of $5 million dollars, not including losses relating to loan and borrower guarantees which Heritage could not honor due to National's bad faith conduct." Compl. ¶ 39. In Heritage's CRN, it stated:

> [N]otwithstanding the filing of Proofs of Claim, the first for $73,386.35 [resulting from employees' fraud and/or theft], and the second for sums of $3,801,976 [resulting from employees' fraud and/or

its damages expert Laurie Holtz, attached to its Response as Exhibit 1, which estimated Heritage's losses at over $4.5 million. Holtz Report, D.E. # 82–3 at 5. Thus, it is clear that Heritage still contends it is entitled to millions of dollars in damages from National Union.

theft], the Insurer, in violation of [sections 624.155 and 626.9541(1)(i) ], took no action whatsoever to acknowledge, to conduct reasonable investigations, to deny or acknowledge coverage, or to attempt to settle the claims as it should have done, as a result of which the entire mortgage business operations of the Insured, which had prospered since 1963, were destroyed.

As explained above, the *only* policy on which Heritage obtained a favorable resolution in the initial action was the 1998 bond, and only in the amount of $55,310. *See Blanchard,* 575 So.2d at 1291. However, Heritage has not brought forth evidence to show how its requested damages, which are presently claimed to be in excess of $4.5 million, could possibly be "reasonably foreseeable" from National Union's alleged violation of sections 624.155 and 626.9541(1)(i)—that is, its alleged bad faith failure to investigate or to pay a $55,310 claim. In fact, it does not appear that Heritage has ever articulated how its requested damages are in any way linked to National Union's alleged bad faith asserted in this action. At most, Heritage refers the Court to Holtz's expert damages report and states that "Defendants' actions caused the damages for the reasons and in the amounts set forth [therein]." Resp., D.E. # 82 at 2, That report is of no help to Heritage in this respect—it is largely concerned with the details of the theft by Heritage's employees. *See* D.E. # 82–2, 3.[8] Holtz did state that Feinstein "assembled substantial funds to cover the massive losses at Heritage" by selling Heritage's rights to service mortgages, by taking out loans in his and in Heritage's name, and by and selling his personal assets. *See id.*

However, Holtz does not explain when such actions were taken, or more importantly, how they were the result of National Union's failure to pay $55,310 on the 1998 bond and how they would have been avoided had National Union paid that amount. In fact, it is clear from his deposition testimony that Holtz never even considered that question. In his deposition Holtz stated: "I can only say that $55,000 would not have solved the damage [meaning the $4.5 million loss he estimated Heritage suffered], the $55,000. The damage that occurred would still have occurred." D.E. # 96–2 at 35. Further, he stated, not surprisingly: "Failure to pay the $55,000 didn't cause the four and a half million dollars worth of damage." *Id.* When asked if he could give an opinion as to how much damage was caused by National Union's failure to pay the $55,000, he said: "No. I have never, ever thought about it." *Id.* at 36.

A loss of $4.5 million which resulted from Heritage's employees' defalcation cannot be "reasonably foreseeable" from, or a result of, National Union's failure to pay a $55,310 claim. Merely because Heritage now alleges such loss and demands payment in that amount does not change this obvious conclusion. The jury in the initial action determined Heritage to be entitled to only $55,310 from National Union on one bond. Thus, Heritage's alleged losses of $4.5 million are not only "grossly excessive," but not attributable to National Union's actions. National Union cannot be held liable for bad faith for not paying Heritage's excessive demand, or investigating such demand, or taking whatever action Heritage claims it should have tak-

---

8. Heritage also claims that "[its] damages are suffered whether they are caused directly by Defendants or whether they were caused by the defalcations of the embezzling employees." *Id.* at 7. This argument misses the point—what matters is whether Heritage's claimed damages were "reasonably foreseeable" from National Union's alleged bad faith, and more importantly, whether they were caused by National Union's failure to settle Heritage's $55,310 claim.

en. *Longpoint* is instructive in this regard. 2005 WL 1315810. There, where the umpire previously determined the claimant entitled to only $100,249.68, the court held that the claimant's demand in its CRN for $538,564.01 was "grossly excessive," or so the insurer could have concluded in good faith. *Id.* at *2. Thus, the insurer was "under no obligation to take a view more favorable to [the claimant] than that ultimately taken by the umpire." *Id.* Such is the case here.

In sum, there is no evidence to suggest that a $4.5 million loss could have been "reasonably foreseeable" from, or the result of, National Union's alleged bad faith refusal to investigate or pay $55,310. In fact, there is no evidence to suggest that Heritage suffered *any* loss as a result of National Union's failure to investigate or pay $55,310. For this additional reason, National Union is entitled to judgment as a matter of law on Heritage's section 624.155 bad faith claim.[9]

## B. AIG's Motion for Summary Judgment

■ Heritage also seeks to hold National Union's parent company, AIG, liable for National Union's alleged bad faith. *See* Compl. ¶ 4. AIG moved for summary judgment arguing AIG is not an "insurer" as contemplated by section 624.155, and also that AIG is not vicariously liable for National Union's alleged wrongdoing. Heritage has since withdrawn its argument that AIG is vicariously liable for National Union's alleged wrongdoing, but does

maintain that AIG was its "insurer." *See* D.E. # 108 at 3. Thus, Heritage's only basis for seeking to recover against AIG is that it was an "insurer" within the meaning of section 624.155.

According to section 624.03, "insurer" is defined as "includ[ing] every person engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance or of annuity." AIG contends that there is no genuine issue as to whether AIG is an "insurer" within the meaning of that statute. AIG has submitted a sworn declaration stating that it is "a holding company for many subsidiaries that provide insurance services and products internationally," D.E. # 60 at 3, and attached an annual report filed with the Securities and Exchange Commission showing that National Union is one of its subsidiaries, *id.* at 7.

In support of its claim that AIG is an "insurer" Heritage points to the exhibits annexed to Feinstein's affidavit, which it claims demonstrate "that Heritage purchased coverage from, was billed directly by, and paid its premium to, AIG. AIG *was* its insurer." D.E. # 108 at 3 (emphasis in original); *see also* Feinstein Declaration, D.E. # 108–3 at 4 ("Heritage bills were sent to us by *AIG*, not National. We paid *AIG*.") (emphasis in original). While Heritage did not direct the Court to a specific exhibit, Feinstein's Declaration refers the Court to Exhibit 8. *See* D.E. # 108–3 at 4. Exhibit 8 is apparently a single bill for a policy premium addressed to Heritage bearing AIG letterhead. *See* D.E. # 109–

---

9. National Union also moved for summary judgment on the basis that it did "cure" Heritage's bad faith claim after receiving the CRN by attempting to fairly resolve Heritage's claims. After oral argument held on June 24, 2008, the Court invited the parties to take limited discovery on that question. After reviewing the parties' submissions, and examining the evidence in a light most favorable to Heritage, the Court determines that while the evidence strongly suggests that National Union acted reasonably in responding to Heritage's claims, the record is not completely clear or undisputed on this point. Therefore, there is just enough of a genuine issue of fact as to whether National Union "cured" Heritage's bad faith claim upon receipt of the CRN such that National Union is not entitled to judgment as a matter of law on that point.

11. This bill is insufficient to create a genuine issue as to whether AIG is "in the business of entering into contracts of insurance or of annuity." As AIG points out, there is no evidence anywhere in the record to suggest that AIG was a licensed insurer or that AIG ever issued insurance policies. Heritage did not even allege in its Complaint that AIG was such an "insurer" within the meaning of section 624.155, only that AIG was vicariously liable for National Union's allegedly unlawful acts. *See* D.E. # 1 ¶¶ 4, 41. Thus, there is no genuine issue as to whether AIG is an "insurer" capable of being sued under section 624.155.

AIG is entitled to summary judgment on Heritage's section 624. 155 claim for other reasons. First, there is no evidence in the record to suggest that Heritage filed a CRN against AIG—this CRN is, as explained above, a condition precedent to filing a bad faith action under section 624.155. Second, as the Florida Supreme Court has made clear, "an insured's underlying first-party action for insurance benefits against the insurer necessarily must be resolved favorably to the insured before the cause of action for bad faith in settlement negotiations can accrue." *Blanchard*, 575 So.2d at 1291. However, since AIG was not a party to the initial action, Heritage cannot satisfy this "favorable resolution of insurance benefits" requirement.[10]

Heritage did not even discuss these points in its Response in opposition to AIG's Motion, much less direct the Court to evidence in the record creating a genuine issue of fact. Instead, Heritage focused on its now-abandoned argument that AIG is vicariously liable for National Union's alleged wrongdoing. In sum, because

there is nothing in the record to suggest that Heritage can recover from AIG in a bad faith claim under section 624.155, AIG is entitled to judgment as a matter of law.[11]

### CONCLUSION

For the reasons articulated above, National Union's and AIG's Motions for Summary Judgment are GRANTED.

### FINAL JUDGMENT

Pursuant to the Order Granting Defendants' Motions for Summary Judgment entered this date, it is hereby ORDERED that Plaintiff The Heritage Corporation of South Florida take nothing by this action and that Defendants National Union Fire Insurance Company of Pittsburgh, PA and American International Group, Inc. go hence without day. The Court reserves jurisdiction over appropriate motions for attorney fees and costs. The Clerk of the Court is directed to mark this case CLOSED and DENY all pending motions as moot.

---

10. *See* Amended Complaint and Final Judgment in *Heritage Corp.*, Case No. 01–3519–CIV–HUCK (D.Es. # 24, 212).

11. Even if Heritage's bad faith claim against AIG did not suffer from these deficiencies, would still fail for the reason discussed above with respect to National Union.