[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-12533
Non-Argument Calendar

_____

D.C. Docket No. 1:19-cv-22983-CMA

ROBERT SHELL,

Plaintiff-Appellant,

versus

AT&T CORP.,

Defendant,

BELLSOUTH TELECOMMUNICATIONS, LLC,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 2, 2021)

Before JORDAN, GRANT, and LAGOA, Circuit Judges.

PER CURIAM:

Robert Shell appeals the district court's order granting summary judgment in favor of his former employer, BellSouth Telecommunications, LLC ("BellSouth"),[1] on his workplace discrimination claims pursuant to the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.10(1)(a). For the following reasons, we affirm the district court's order granting summary judgment.

## I.    FACTUAL AND PROCEDURAL HISTORY

Shell, an African American man born in 1959, worked as a Services Technician in BellSouth's Field Operations/Technical Field Services Southeast department for approximately forty-one years, beginning in 1977. As a Services Technician, Shell would receive field work assignments related to the installation and maintenance of telephone services, which he performed independently at customers' sites. Part of his responsibilities included: (1) climbing poles and ladders and working aloft with small tools; (2) working outside in all kinds of weather; (3) following established safety procedures; (4) lifting and moving loads up to one hundred and twenty pounds; and (5) driving a company vehicle. Shell was also a

---

[1] In his amended complaint, Shell substituted BellSouth for AT&T Corp., the defendant he originally named. BellSouth is wholly owned by a series of entities ultimately owned by AT&T, Inc.

2

member of the Communication Workers of America union and a nonmanagement employee with no supervisory responsibilities.

In 2017 and 2018, Armando Toledo, a Hispanic man born in 1958, was Shell's immediate supervisor and the Manager Network Services. As the Manager Network Services, part of Toledo's responsibilities included: (1) managing crews of technicians who engage in installation and maintenance of telephone services at customer sites or company locations; (2) conducting safety and quality inspections to ensure high quality and safe performance by technicians; (3) ensuring that all functions are performed by technicians in a timely fashion to meet customer and company specifications; and (4) making recommendations and administering discipline to technicians. During this time, Toledo's supervisor, the Area Manager of Network Services, was Alberto Morhaim, a Hispanic man born in 1956. Morhaim, in turn, reported to the Director of Network Services, Gary Koontz, a White man born in 1962. As the Director of Network Services, part of Koontz's responsibilities included: (1) overseeing the operation and supervising management employees, including the Area Managers, (2) working in BellSouth's Field Operations/Technical Field Services Southeast department; and (3) making recommendations and approving terminations of services technicians working under his organization.

3

As of September 2018, Shell was one of twenty services technicians working under Toledo's supervision. The group consisted of ten Hispanics, four Black individuals, four White individuals, one American Indian/Alaskan Native, and one person of undeclared race. In addition to Shell, fourteen technicians working under Toledo's supervision were older than the age of forty.

The basis for Shell's lawsuit largely stems from an altercation between Shell and Toledo on August 14, 2018, which ultimately led to Shell's termination. On that day, Morhaim reported to AT&T Services, Inc./BellSouth's Asset Protection—the department responsible for investigating incidents involving threats or violence in the workplace—that Shell physically assaulted Toledo near a customer site in Golden Beach, Florida. Morhaim told Asset Protection that Toledo reported the incident to the Golden Beach Police Department and requested an internal investigation. Morhaim provided Asset Protection copies of Toledo's written statement to the Golden Beach Police Department and an email communication that Shell sent to Winston Passley, another Manager of Network Services, on the day of the incident. Morhaim also informed Asset Protection that the Golden Beach Police placed Shell under non-custodial arrest at BellSouth's garage. As part of the internal investigation, Guillermo Ramos, the Senior Investigator of Asset Protection, interviewed both Shell and Toledo, and they each provided signed, written statements concerning what occurred that day.

4

According to Toledo, he visited Shell at the customer site to conduct safety and quality inspections. While Toledo was discussing his findings with Shell regarding a deviation from the quality inspection and coaching him, Shell told Toledo that he was overheating and not feeling well.[2] Concerned about Shell's health, Toledo told Shell to take a break. As they walked to their vehicles, Toledo noticed that Shell was stumbling. Shell told Toledo that he felt dizzy and was going to sit and idle in the vehicle. Toledo suggested that Shell sit and cool off in his company vehicle instead because idle time was not monitored, and Toledo turned on his company vehicle and its air conditioner. Shell declined, stating, "No, no. I am going for a drive. Are you telling me I cannot take my break?" Toledo answered, "You can take the break as soon as you cool down because I want to assess you and make sure you're ok." Shell declined again, stating, "No, I'm going to go for a cup of coffee," and began walking towards his vehicle. Toledo was concerned about Shell's condition to drive, noting that Shell fell ill and exhibited symptoms of heat illness at work on two prior occasions. On both occasions, Shell told Toledo about his symptoms, and the paramedics were called.

---

[2] Both Toledo and Shell were trained on how to recognize the signs and symptoms of heat illness and how to respond to heat illness at work. Part of this training included providing employees a Job Aid listing symptoms such as dizziness, light-headedness or fainting, weakness, mood changes, irritability, confusion, feeling nauseous, or vomiting.

5

Because of his concern, Toledo stood between Shell and his vehicle. Shell non-aggressively pushed Toledo back and got into his vehicle, but Toledo asked for Shell's keys. Again, Shell asked if Toledo was telling him that he could not take his break, so Toledo told Shell to wait while he called two union stewards to dissuade Shell from driving, but he could not reach them. While Toledo made these calls, Shell insisted that he was a union steward, held up his cell phone, and told Toledo he was going to record the conversation to show that Toledo was not allowing him to take his break. In his statement to Asset Protection, Toledo denied telling Shell that he could not take his break but rather "was concerned . . . that [Shell] was a danger to himself or others." When Toledo saw that Shell was going to put the keys into the ignition, he "reached over to try and take the keys," but accidentally knocked Shell's cellphone out of his hand. In his statement to Asset Protection, Toledo denied touching Shell before this point but acknowledged that he "may have touched [Shell] as [they] tried to catch the phone."

At this point, Shell "violently pushed" Toledo away from Shell's company vehicle and pinned Toledo against his own vehicle with Shell's forearm, striking Toledo's face and head at least four times while shouting, "Don't you ever touch me again, mother f**ker. I'll kill you!" As Toledo was getting up, Shell told him, "I'm going on my break now," and drove away. Toledo then reported the incident to Passley, Morhaim, and the Golden Beach Police Department, and Morhaim took

6

Toledo to a medical services provider for treatment of his injuries, which consisted of cuts and large bruises on his shins and knees, three contusions on the left side of his face, and contusions on the backs of his upper arms. Toledo indicated that he was caught off-guard by Shell's attack and denied fighting back during the altercation.

According to Shell, Toledo had a history of checking up on him to see if he was working, doing so on two separate occasions even though he never did the same with white workers. On the date of the incident, Shell told Toledo that he was feeling faint and going on break, but Toledo yelled at him, telling him he could not go on break without explaining why. Shell declined Toledo's offer to sit inside Toledo's company vehicle because he wanted to get a cold drink from the store, and he stated that he was not dizzy and felt capable of safely driving. Shell proceeded to the rear of his vehicle, picked up the cones around it, placed them inside his vehicle, and walked around Toledo to his driver's side door and got in. Toledo yelled about something Shell could not recall, and Shell attempted to video him because he was concerned about Toledo's irrational behavior. Shell denied that Toledo asked for his keys and stated that while he was seated in the vehicle, Toledo walked over and "lunged" at him by lowering his head and bringing his arms around, grabbed Shell by the shoulders, and knocked Shell's phone from his hand. Shell indicated that he

7

did not believe Toledo was concerned about his safety but rather was concerned about Shell videoing him.

Shell felt threatened and did not know "what [Toledo's] intentions were or if he intended to harm [him]." Shell's instinct was to get Toledo off of himself, and he got out of his vehicle and "pushed [Toledo] onto the hood of [Toledo's] vehicle with [his] hands." Shell did not recall pinning Toledo down or striking him with his fist. In his statement to Asset Protection, Shell indicated that a police detective reviewed surveillance footage showing he "pushed Toledo backwards with great force then pinned him to the vehicle," but Shell disputed that characterization, stating that he recalled "pushing Toledo away from [himself], Toledo falling to the ground, then getting up."[3] Although Shell does not dispute Toledo's injuries, he denied "inflicting any of Mr. Toledo's asserted injuries in anything other than self-defense." Shell also did not remember saying, "Don't you ever touch me, motherf**ker, I will kill you." After Shell drove away from the site, he called Morhaim but was unable to reach him. Shell reported the incident to Passley in an email that day stating that Toledo lunged at him and grabbed him and that Shell felt threatened and pushed Toledo against the hood of Toledo's vehicle. Shell also called Toledo and told him

---

[3] Shell filed a CD in the district court below containing video recordings of police surveillance footage and an enhanced video recording of that footage depicting the altercation between Toledo and Shell. The district court noted that "[a]lthough difficult to make out, the footage appears to corroborat[e] Toledo's and [Shell's] accounts of what happened."

8

that he was going to the office "to cool off," and he remained there until the police arrived and arrested him.[4]

On August 15, 2018, BellSouth relieved Shell of his duties with pay pending the outcome of the internal investigation requested by Morhaim. As part of Asset Protection's investigation and in addition to reviewing the signed, written statements provided by Toledo and Shell, Ramos conducted a forensic analysis of Shell's cell phone, but it revealed no recording of the incident. Ramos also attempted to secure a copy of video footage from surveillance cameras near the incident. However, the Golden Beach Police Department informed him that a police technical team was in the process of enhancing the video and that the footage was being used to determine whether to proceed with criminal misdemeanor battery charges against Shell. The Golden Beach Police Department also informed Ramos on September 10, 2018—the day of Shell's termination—that the video footage was still in the process of being enhanced and that it was not available for public viewing because it was evidence in an open investigation.

Ramos subsequently prepared an Asset Protection Report summarizing the evidence he gathered and his findings after the investigation, and he shared a copy

---

[4] According to Shell, he was charged with misdemeanor battery as a result of the altercation. In a partial trial transcript of the criminal proceedings attached to his supporting memorandum, Shell testified in his defense that he pushed Toledo off of himself after Toledo grabbed him. In his deposition, Shell testified that the jury acquitted him.

of this report with Koontz and Leticia Robertson, the Employee Relations Manager in AT&T's Human Resources department. Ramos's report found, among other findings, that Shell pushed Toledo onto a vehicle and pinned him down, but it made no recommendation as to whether Shell should be terminated. Ramos testified in his deposition that he prepared investigations as concise and accurate as possible so that they could support the company's position in arbitration or other legal matters. He also stated that although he could not recall a specific, written work rule, BellSouth supervisors were "not supposed to put [their] hands on anyone."

BellSouth's employees are subject to its Code of Business Conduct ("COBC"). Under the subsection titled "[w]e create a safe and secure place to work," the COBC states that AT&T "do[es] not tolerate or permit threats, violence, or other disruptive behavior in [its] work environments." Shell indicated he was aware that BellSouth's COBC prohibited violence in the workplace, that violations of the COBC could lead to disciplinary action, including termination, and that he knew of his obligation to treat colleagues courteously, professionally, and with respect.

Koontz and Morhaim, with Robertson's concurrence, terminated Shell's employment on September 10, 2018, determining that "Shell had engaged in serious violations of the Company's COBC and its workplace violence policy by engaging in physical acts of violence in the workplace against Toledo on August 14, 2018."

10

Toledo did not receive a copy of the report and, according to BellSouth and Toledo's own declaration, he did not participate in the decision to terminate Shell's employment. However, Shell stated in his deposition that although he did not "[f]actually" know who made the decision to terminate him, Toledo indicated in a subsequent "employment hearing" that he had made the decision to terminate Shell. BellSouth did not replace Shell after his termination because it was BellSouth's practice at the time to not replace services technicians due to a decline in volume of work and gains in productivity.

On June 10, 2019, Shell sued his former employer for age and race discrimination in Florida state court under the FCRA. BellSouth removed the action to federal court. In his amended complaint, Shell alleged that Toledo assaulted him on August 14, 2018, that he was subsequently terminated while Toledo neither received discipline nor was terminated, and that BellSouth discriminated against him in the terms and conditions of his employment, harassed him, and otherwise denied him job opportunities because of his age and race.

BellSouth moved for summary judgment on both of Shell's claims after discovery. In relevant part, it argued that Shell could not establish a prima facie case of race discrimination because he could not show that it treated a similarly situated employee of a different race more favorably. BellSouth contended that Toledo, a Hispanic male, was not similarly situated to Shell because Toledo and Shell

11

occupied different position with different responsibilities and because Toledo did not engage in the same conduct as Shell. It further argued that while Shell admitted to violating its workplace violence policy, Toledo did not admit to committing a similar infraction. BellSouth also argued that Shell could not establish a prima facie case of age discrimination because he could not show that it treated a similarly situated younger employee more favorably than him, noting that (1) Toledo, who was four months older than Shell, was not a proper comparator, that (2) 75% of the technicians in Toledo's team were older than forty, and that (3) Koontz and Morhaim, the managers who decided to terminate Shell, were also older than forty.

BellSouth further argued that even if Shell could establish a prima facie case of race or age discrimination, it had a legitimate, nondiscriminatory reason for terminating him—Shell's violation of the company's workplace violence policy. It noted that Shell admitted to pushing Toledo back toward the hood of Toledo's car and that BellSouth terminated Shell only after conducting a thorough investigation and making attempts to secure a copy of video surveillance footage of the August 2018 incident. Finally, BellSouth argued that Shell lacked any evidence to show that this reason was pretextual and that the real reason for his termination was his race or age.

In response, Shell argued that summary judgment was inappropriate because his evidence made out a prima facie case of race and age discrimination. He also

12

noted that a plaintiff could survive summary judgment if he presented a "convincing mosaic" of evidence sufficient to give rise to an inference of discrimination, citing this Court's decision in *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011). With respect to race discrimination, he argued that he made a prima facie case based on his testimony that his Cuban-American supervisor laid hands on him, that he acted in self-defense, and that only he, an African-American, was fired. Shell contended that if one accepted his testimony as true, Toledo went to his worksite to pick a fight, and he had pushed Toledo while acting in self-defense. Because he acted "purely in self-defense," Shell maintained that Toledo was the one who violated BellSouth's COBC. He then argued that no one at BellSouth waited to obtain the surveillance video of the incident before terminating him, that he was fired after Toledo screamed at him and laid hands on him, that Morhaim and Ramos did not believe Shell's version of events, and—without any citations to the record—that the investigations undertaken by Asset Management[5] and Human Resources were *pro forma*. Shell also argued that a reasonable jury could conclude that Toledo and Morhaim had used BellSouth's upper-level management as their "cat's paws." If the jury credited his testimony, Shell contended it could infer that the real reason for

---

[5] Shell appears to have mistakenly used "Asset Management" in his response to refer to the investigation conducted by "Asset Protection."

13

terminating him was racial discrimination, given that he was among the four black services technicians out of the twenty services technicians supervised by Toledo.

As to his age discrimination claim, Shell noted that he was substantially older than many of the other members of the group supervised by Toledo and that he believed his age was a factor in his termination because BellSouth wanted to get an older, more expensive employee off its payroll. He then argued that a jury could infer that BellSouth wanted to terminate him because of his age, given his highly unionized work environment. He also contended that a jury could conclude that BellSouth fired him because of his age if it credited his testimony about the incident. Although he referred to his age discrimination claim while discussing the law concerning the "cat's paw" theory of liability, he did not do so in the analysis and argument portion of his supporting memorandum.

On June 8, 2020, the district court granted summary judgment in favor of BellSouth on Shell's race and age discrimination claims. In addressing Shell's race discrimination claim, the district court found that the "cat's paw" theory did not apply because Shell provided no evidence showing that Toledo recommended his termination. Rather, it noted that Toledo did not conduct the internal investigation, never received a copy of the Asset Protection Report, and did not participate in the decision to terminate Shell. The district court also noted that Morhaim was not a party without decision making authority because he, along with Koontz, decided to

14

terminate Shell's employment.  The district court did not expressly address whether Toledo was a comparator.  Rather, assuming that Shell had made out a prima facie case, the district court ruled that BellSouth articulated a legitimate, nondiscriminatory reason for firing him—Shell's violation of the COBC's prohibition on violence in the workplace—and that Shell failed to show discriminatory intent by alleging that BellSouth's investigation into the incident had been inadequate, in part because it fired him before obtaining the surveillance video. The district court also ruled that Shell did not show that BellSouth's explanation for terminating him was pretextual because he did not point to any evidence in the record demonstrating that BellSouth's proffered reason was false or that his termination was motivated by discriminatory animus.

As for Shell's age discrimination claim, the district court ruled that, to the extent Shell intended to assert Toledo as a proper comparator, his claim failed because Toledo was also within a protected age group and not a proper comparator. The district court further ruled that Shell had not pointed to sufficient evidence in the record demonstrating BellSouth's discriminatory intent and that his "speculative explanation of the reason for his termination" did not create a triable issue concerning BellSouth's discriminatory intent.  With respect to Shell's "cat's paw" argument, the district court refused to consider it because Shell only discussed general legal principles for the application of the "cat's paw" theory to age

15

discrimination claims and failed to elaborate on the theory with respect to his age discrimination claim.  Shell filed a timely notice of appeal.

## II.    STANDARD OF REVIEW

"We review the district court's grant of summary judgment *de novo*." *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1288 (11th Cir. 2003).  We use the same legal standards as the district court.  *See Smith v. Fla. Dep't of Corr.*, 713 F.3d 1059, 1063 (11th Cir. 2013).  "Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of fact and compels judgment as a matter of law.  *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

## III.    ANALYSIS

On appeal, Shell argues that that the district court erred in granting summary judgment to BellSouth as to both of his workplace discrimination claims.  We first address Shell's race discrimination claim and then turn to his age discrimination claim.[6]

---

[6] In the "Statement of the Case" section of his initial brief, Shell also appears to challenge the admissibility of any findings in the Asset Protection Report and the report itself.  However, Shell fails to "plainly and prominently" raise these issues in the argument section of his brief and therefore we find that these issues are waived.  *United States v. Willis*, 649 F.3d 1248, 1254 (11th Cir. 2011); *see also Lavigne v. Herbal Life, Ltd.*, 967 F.3d 1110, 1120 n.7 (11th Cir. 2020) ("Normally, we do not review arguments that were raised only in a footnote without supporting argument."); *U.S. S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 811–12 (11th Cir. 2015) (explaining that the failure to flesh out arguments except by referring to them in a footnote is insufficient to properly assert a claim on appeal).

16

**A. Race Discrimination Claim**

The FCRA prohibits employers from discriminating against an individual based on the individual's race or age. Fla. Stat. § 760.10(1)(a). Race discrimination claims under the FCRA are governed by the same analytical framework as discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2. *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010); *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998). To survive summary judgment on a discrimination claim based on circumstantial evidence, an employee generally must satisfy the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this framework, the employee bears the initial burden to establish a prima facie case of discrimination. *Id.* A prima facie case of discrimination under Title VII requires a plaintiff to show that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified to perform the job; and (4) his employer treated "similarly situated" employees outside the protected class more favorably. *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc). For the similarly situated prong, the employee must prove that he and his comparators are "similarly situated in all material respects," i.e., that the employee and his comparators must have been engaged in the same basic conduct and subjected to the same work rules. *Id.* at 1227–28.

17

If the employee satisfies this initial burden, the burden shifts to the employer to proffer "a legitimate, nondiscriminatory reason for its actions." *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)). If the employer proffers such a reason, the burden shifts back to the employee to show that the employer's reason is pretextual. *McDonnell Douglas*, 411 U.S. at 804. To establish pretext, the plaintiff must show that (1) the reason offered was false and (2) discrimination was the real reason for the employer's actions. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). In other words, an employee must rebut the employer's proffered nondiscriminatory reason and cannot succeed by merely disputing the wisdom of this reason. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). Accordingly, we have held that employers may terminate an employee for "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)). Therefore, even if an employee's evidence supports an inference that the proffered reason is "pretext of *something*," summary judgment is appropriate if the employee does not produce evidence that the reason was pretext of *discrimination*. *Id.* at 1337–38.

18

Moreover, an employee's "[c]onclusory allegations of discrimination, without more," will not support an inference of pretext when an employer offers extensive evidence of legitimate, nondiscriminatory reasons for its actions. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1313 (11th Cir. 2016) (quoting *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996)). Instead, an employee must produce evidence that "reveal[s] such weaknesses, implausibilities, inconsistencies, incoherencies[,] or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Id.* (quoting *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005)).

Separate from the *McDonnell Douglas* framework, an employee may also survive summary judgment in a discrimination case if he "presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith*, 644 F.3d at 1328. Under this framework, a "triable issue of fact exists if the record, viewed in a light most favorable to the [employee], presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (footnote omitted) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)).

Shell argues that the district court erred in granting summary judgment on his race discrimination claim for several reasons. First, he argues that he was not

19

required to point to a comparator to create a triable issue concerning BellSouth's discriminatory evidence and that, even if he was required to do so, he identified Toledo as a comparator below. Shell contends that he and Toledo were similarly situated in all material respects because they both allegedly violated the same work policy but only Shell was terminated. In support of his argument, Shell cites to this Court's decision in *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786 (11th Cir. 1999). In *Lathem*, this Court concluded that the "relevant inquiry" to determine whether two employees are similarly situated is not "whether the employees hold the same job titles," but "whether the employer subjected them to different employment policies," and that "[w]hen an individual proves that he was fired but one outside his class was retained although both violated the same work rule, this raises an inference that the rule was discriminatorily applied." *Id.* at 793 (quoting *Nix*, 738 F.2d at 1186)).

However, Shell's reliance on *Lathem* is misplaced. In that case, the employer accused the employees of the same conduct—having a relationship with a minor client and failing to cooperate in the subsequent investigation—but disciplined them differently by transferring one and firing the other. *Id.* Here, although Toledo's and Shell's accounts of the altercation differ, Toledo did not admit to engaging in acts of physical violence against Shell, which would have violated BellSouth's COBC. By contrast, Shell admitted to pushing Toledo against the hood of Toledo's car in both

20

his email to Passley and in his written statement to Ramos.    Moreover, Shell and Toledo maintained different positions in BellSouth with different responsibilities. Toledo was a Manager of Network Services and responsible for managing crews of telephone service technicians, while Shell was a Services Technician, a nonmanagement employee with no supervisory responsibilities.  In light of Shell's admissions and the differences between the positions occupied by Shell and Toledo, Shell and Toledo are not "similarly situated in all material respects."  *Lewis*, 918 F.3d at 1227–28.

Shell's other arguments are likewise unavailing.  Shell also contends that the district court erred by finding that the "cat's paw" theory did not apply to his race discrimination claim, explaining that a reasonable jury could find that Toledo and Morhaim used the upper-level management at BellSouth as their "cat's paw" to fire him based on Toledo's version of the events.  An employee can establish liability under the cat's paw theory when an adverse employment action occurs based on a biased recommendation by a party without decision-making authority.  *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331–32 (11th Cir. 1999).  Under this theory, if the decision-making party followed the biased recommendation without independently investigating the complaint—essentially acting as a "rubber stamp" of the biased subordinate—then the subordinate's discriminatory animus is imputed to the decision-making party.  *Id*. at 1332.  However, the employee must prove that

21

the discriminatory animus behind the recommendation, and not the identified employee misconduct, caused the adverse employment action. *Id*. at 1331.

We disagree with Shell's cat's paw argument for three reasons. First, the record shows that Morhaim had decision-making authority and that Morhaim, along with Koontz and the concurrence of Robertson, terminated Shell's employment after a thorough investigation determined that Shell had "engaged in serious violations of the Company's COBC and its workplace violence policy by engaging in physical acts of violence in the workplace against Toledo on August 14, 2018." Second, Shell does not point to evidence in the record showing that Morhaim, or any of the decisionmakers, relied on a biased recommendation without conducting an independent investigation when they terminated him. Rather, Shell argues in a conclusory and speculative fashion that the investigations conducted by Asset Protection and Human Resources were *pro forma* and unquestioning of Toledo and Morhaim. To the contrary, the record demonstrates that (1) Ramos interviewed both Shell and Toledo and obtained signed, written statements from each of them concerning what occurred that day, (2) Ramos conducted a forensic analysis of Shell's and Toledo's cell phones and attempted to secure a copy of video footage from surveillance cameras, and (3) Ramos's report, which summarized the evidence gathered in the course of Asset Protection's investigation and made relevant findings, made no recommendation as to whether Shell should be terminated. Third,

22

there is no evidence in the record showing that Toledo recommended that Shell be terminated. Rather, it shows that Toledo was not part of Asset Protection's investigation, never received a copy of the report, and did not participate in the decision to terminate Shell.

Furthermore, even if Shell could demonstrate a prima facie case of racial discrimination, he cannot establish that BellSouth's purported reason for terminating him was pretextual. Shell contends that he presented evidence the BellSouth's proffered reason for firing him was pretextual. Specifically, he argues that although he indicated that Toledo was the aggressor, BellSouth accepted Toledo's version of the events and only fired him. But his arguments fail to address the first prong of his burden to prove pretext—that the proffered reason was false. *See Chapman*, 229 F.3d at 1030. Indeed, Shell failed to present any evidence in the record showing that he did not violate BellSouth's COBC policy prohibiting violence in the workplace. Rather, he admitted to pushing Toledo against the hood of Toledo's car in both his email to Passley and his written statement to Ramos.

Shell also failed to present circumstantial evidence of racial discrimination to overcome summary judgment. Shell argues that he has shown a convincing mosaic of circumstantial evidence sufficient to show a race discrimination claim. Shell contends that he, an African-American, and Toledo, a Cuban-American, were both subject to BellSouth's workplace violence policy, and that if one accepts Shell's

23

testimony as true, Toledo went to the customer site to pick a fight with him, that Toledo was the aggressor during the altercation, and that he pushed Toledo while acting in self-defense. He then notes that Morhaim and Ramos, like Toledo, were Cuban-Americans and did not question Toledo's account of the incident, and that no one at BellSouth waited to obtain surveillance video of the incident before terminating him. These arguments are unavailing. Apart from his own speculative and conclusory allegations, Shell fails to point to anything in the record from which a reasonable inference of discriminatory intent might be drawn. *See id.* The district court therefore properly granted summary judgment in favor of BellSouth on Shell's race discrimination claim.

## B. Age Discrimination Claim

Age discrimination claims under the FCRA are governed by the same analytical framework as discrimination claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a). *Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1266 (11th Cir. 2014). To survive summary judgment on an age discrimination claim based on circumstantial evidence, an employee generally must satisfy the *McDonnell Douglas* burden-shifting analysis. *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012). And, as with race discrimination claims, an employee may also survive summary judgment on an age discrimination claim by presenting a "convincing mosaic" of circumstantial

24

evidence that creates a triable issue concerning the employer's discriminatory intent. *See Smith*, 644 F.3d at 1328.

Although Shell argues that the district court erred in granting summary judgment on his age discrimination claim, we must address two initial matters. First, Shell does not argue in his initial brief that Toledo was a proper comparator with respect to his age discrimination claim or otherwise argue that he established a prima facie case of age discrimination. Shell therefore has abandoned such arguments. *See Willis*, 649 F.3d at 1254 ("'[A] party seeking to raise a claim or issue on appeal must plainly and prominently so indicate.' . . . Where a party fails to abide by this simple requirement, he has waived his right to have the court consider that argument." (first alteration in original) (quoting *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003))). And as such, the only available theory he may proceed under is the convincing mosaic theory.

Second, Shell asserts that the district court erred in refusing to apply a cat's paw theory to his age discrimination claim on the ground that he failed to elaborate on this theory with respect to his age discrimination claim in his memorandum of law. In support of his argument, Shell points to portions of his response to the summary judgment motion below as well as his combined discussion of pretext for both claims. Even assuming a cat's paw theory of liability applies to age discrimination claims under the ADEA, *see Sims v. MVM, Inc.*, 704 F.3d 1327,

25

1335–36 (11th Cir. 2013) (indicating that the cat's paw theory of liability is inappropriate when the statute requires but-for causation), our review of Shell's response in opposition to BellSouth's motion for summary judgment shows that he failed to make specific cat's paw arguments with respect to his age discrimination claim. Consistent with the district court's ruling, and because Shell makes no plain-error argument, we decline to address Shell's abandoned cat's paw arguments concerning this claim. *See Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) (explaining that a party "cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motion[]" (quoting *Johnson v. Bd. of Regents*, 263 F.3d 1234, 1264 (11th Cir. 2001))).

This leaves us only with Shell's argument that he presented a circumstantial evidence of age discrimination to overcome summary judgment. His contentions here largely mirror those with respect to his race discrimination claim, but Shell further notes that he presented evidence that he was almost sixty years old when BellSouth terminated him and that he was one of three substantially older services technicians supervised by Toledo. He also argues that BellSouth's acknowledgment that it was not replacing any services technicians because of a decline in volume and an increase in productivity, supported his contention that his age was a factor in his termination. Specifically, Shell argues that "[b]ecause [BellSouth] could get

26

somebody expensive, an older person, off the payroll" in a highly unionized working environment, a reasonable juror could infer that BellSouth terminated him because of his age. This argument by Shell, however, as the district court found fell well short of "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination" by BellSouth. *See Smith*, 644 F.3d at 1328 (footnote omitted) (quoting *Silverman*, 637 F.3d at 734). Indeed, even viewing the record in the light most favorable to Shell, there is no evidence demonstrating that BellSouth had any discriminatory intent in terminating Shell. Accordingly, the district court properly granted summary judgment in favor of BellSouth on this claim.

## IV.    CONCLUSION

For the foregoing reasons, we affirm the district court's order granting summary judgment in favor of BellSouth on Shell's age and race discrimination claims.

**AFFIRMED.**

27